194 P.3d 1098

Daphne E. BARBEE; Finn T. Barbee, and Rustam A. Barbee, Plaintiffs–Appellants,

v.

The QUEEN'S MEDICAL CENTER; and William Yarbrough, M.D., Defendants–Appellees

and

Doe Defendants 1–10, Defendants.

No. 28084.

Intermediate Court of Appeals of Hawai'i.

Sept. 30, 2008.

Reconsideration Granted in Part and Denied in Part and Amended Oct. 31, 2008.

As Corrected Nov. 5, 2008.

Certiorari Rejected March 11, 2009.

Andre' S. Wooten, on the briefs, Honolulu, for Plaintiffs–Appellants.

Richard J. Kowen and Jan M. Vernon (Alston Hunt Floyd & Ing), Honolulu, on the briefs, for Defendant–Appellee The Queen's Medical Center.

Thomas E. Cook and Bradford F.K. Bliss (Lyons, Brandt, Cook & Hiramatsu), Honolulu, on the briefs, for Defendant–Appellee William Yarbrough, M.D.

RECKTENWALD, C.J., WATANABE and FUJISE, JJ.

Opinion of the Court by
RECKTENWALD, C.J.

## I. INTRODUCTION

Daphne E. Barbee (Daphne), Finn T. Barbee (Finn), and Rustam A. Barbee (Rustam) (collectively, Plaintiffs) filed a complaint against William Yarbrough, M.D., (Dr. Yarbrough)[1] and The Queen's Medical Center (Queen's) (collectively, Defendants).[2] Plaintiffs alleged that Defendants were negligent in treating their father, Lloyd Barbee (Mr. Barbee), for a kidney tumor. Dr. Yarbrough performed a laparoscopic nephrectomy at Queen's on July 24, 2001, during which Mr. Barbee's left kidney was removed. Subsequent to the removal of his kidney, Mr. Barbee sustained internal bleeding. Dr. Yarbrough performed a second surgery on the evening of July 24th to locate the source of and stop the bleeding. Mr. Barbee's condition deteriorated following the two surgeries, and he died 17 months later, on December 29, 2002.

---

1. Dr. Yarbrough clarified at trial that, contrary to the spelling in the case caption and Plaintiffs' briefs, the correct spelling of his name is "Yarbrough" rather than "Yarborough."

2. A third defendant, Barak Younoszai, D.O. (Dr. Younoszai), was named in the complaint, but the claims against him were subsequently dismissed.

A jury returned a special verdict against Queen's and Dr. Yarbrough and awarded $365,000 to each of the three Plaintiffs. However, the Circuit Court of the First Circuit[3] (circuit court) granted Queen's and Dr. Yarbrough's renewed motions for judgment as a matter of law and conditionally granted Dr. Yarbrough's motion, in the alternative, for a new trial. Plaintiffs appeal, arguing that "the trial court erred in granting judgement notwithstanding the jury verdict," and "in limiting the testimony" of two of their witnesses, Dr. Peter Bretan (Dr. Bretan) and Dr. Sean Keane (Dr. Keane). For the reasons set forth below, we affirm.

## II. BACKGROUND

### A. Factual Background

Mr. Barbee was a seventy-five-year-old attorney. There was testimony and records introduced at trial indicating that he had a history of cancer, hypertension, Type 2 diabetes, glaucoma, esophageal stomach reflux, pseudogout, and anemia.

Some time in 2001, a CT scan revealed that Mr. Barbee had both a lesion on his lung and a mass on his left kidney. A biopsy indicated that Mr. Barbee had developed "primary renal carcinoma," or kidney cancer. Although he lived in Wisconsin, Mr. Barbee elected to undergo treatment in Hawaiʻi because all three of his children resided in Honolulu.

On June 7, 2001, Mr. Barbee saw Dr. Yarbrough at Queen's for a second opinion and consultation on his kidney tumor. On July 24, 2001, Dr. Yarbrough performed the laparoscopic nephrectomy on Mr. Barbee. Dr. Yarbrough testified that during the surgery, he noticed a "small hematoma," which is a "little bruise" or a collection of blood, "in one area of the mesentery, probably where the Veress needle entered."[4] Dr. Yarbrough testified that the hematoma "was not something that anybody would be alarmed of. It has no reason to go for [sic] [intensive care unit (ICU)] for that." Dr. Yarbrough testi-

fied that he "didn't see any bleeder during the procedure."

Nurse Joyce Hong (Nurse Hong), who worked in the recovery room at Queen's on July 24, 2001, testified that Mr. Barbee was transferred from the operating room to the recovery room at 10:55 a.m. At some point in the recovery room, Mr. Barbee was "moaning." Nurse Hong administered Demerol, which seemed to reduce his pain level. Queen's had various criteria for releasing a patient from the recovery room, including urine output and oxygen saturation, and Mr. Barbee was discharged from the recovery room at 12:20 p.m., after he had met those criteria.

Dr. Yarbrough requested that Mr. Barbee be taken to floor Pauahi 7(P–7) after being discharged from recovery. P–7 is "the floor that recovers almost all of [Queen's] nephrectomies." Dr. Yarbrough testified that Mr. Barbee "did not meet criteria" to be transferred to another floor where more frequent monitoring could be provided.

Nurse Nicole Cosindas (Nurse Cosindas) worked from 3 p.m. to 11 p.m. on July 24, 2001 on P–7. She testified that Queen's has policies and procedures regarding charting the vital signs of a post-surgical patient after the patient is discharged from the recovery room, and that this schedule was followed in Mr. Barbee's case. Nurse Cosindas testified that if she "had noticed something that had concerned [her]," or "something that was out of the ordinary," before vital signs were due to be recorded, she would have "made an action that was appropriate addressing that issue."

At 3:15 p.m., Dr. Yarbrough received a call that there was "no acute distress, but there was complaint of pain to the op site." Dr. Yarbrough contacted "the nurse," and ordered a patient-controlled morphine pump.

Nurse Cosindas testified that at 4 p.m., either she or a unit assistant took Mr. Barbee's vital signs, and Nurse Cosindas performed a physical examination of Mr. Bar-

---

**3.** The Honorable Gary W.B. Chang presided.

**4.** A Veress needle is used to gain access to the abdomen and to fill the abdomen with carbon dioxide during a laparoscopic nephrectomy.

bee.[5] Mr. Barbee's blood pressure was 147/75, which was within normal range for post-operative patients. Mr. Barbee was alert and oriented and his heart rate and skin color were normal. His heart rhythm and oxygen saturation were normal. His lungs were clear and his pulse was "palpable," or easy to feel and adequate. Mr. Barbee's abdomen was soft, meaning "there was nothing underneath the abdomen that would make it firm or hard," such as internal bleeding.

Mr. Barbee was administered Droperidol for nausea at 4:30 p.m., and an antibiotic at 5:00 p.m. At 6:30 p.m., Mr. Barbee was given a patient-controlled morphine pump. His abdomen was "soft but tender due to incisions." Nurse Cosindas did not take Mr. Barbee's vital signs after administering the morphine.

Nurse Cosindas testified that at 6:45 p.m., Mr. Barbee's blood sugar was greater than 600, which is as high a number as the machine used to check blood sugar can register. Mr. Barbee also complained of "increased thirst."

Dr. Yarbrough testified that Mr. Barbee's blood sugar was intentionally kept high because low blood sugar can send a post-operative patient into shock. Dr. Yarbrough testified that Mr. Barbee's high blood sugar was due to the glucose in the fluids he received through his IV. Dr. Yarbrough testified that he was called at 6:55 p.m. and apprised of the situation, and ordered the nursing staff to give Mr. Barbee insulin, and to change his IV from sugar to saline. Nurse Cosindas testified that she did not take Mr. Barbee's vital signs after verifying that his blood sugar was over 600.

Nurse Cosindas testified that at 7:30 p.m., Mr. Barbee's family reported that Mr. Barbee was "disoriented/confused." Mr. Barbee had not had any urine output for the previous 40 minutes. Nurse Cosindas then took Mr. Barbee's vital signs for the first time since 4 p.m. Mr. Barbee's blood pressure was 80/40, indicating "low circulating blood volume," his heart rate was 104, his temperature 98.2, and his fingers "cool to [the] touch." Nurse Cosindas was unable to obtain an oxygen saturation reading "due to poor peripheral perfusion." Nurse Cosindas gave Mr. Barbee saline, increased his oxygen, rechecked his blood sugar, obtained an EKG and blood work, and contacted the crisis nurse and the "house officer."

Nurse Cosindas testified that at 7:55 p.m., Mr. Barbee had a hemoglobin reading of 7.5, which indicated a "low uncirculating hemoglobin level." A second test performed at 9:27 p.m. revealed that Mr. Barbee's hemoglobin had dropped to 3. A normal hemoglobin reading is "[a]round 12, 14."[6]

Dr. Yarbrough testified that at about 7:55 p.m., he received a call that Mr. Barbee's blood pressure had dropped. At that time, he was about to have dinner at a restaurant with his wife. He paid the bill, dropped his wife off, and drove toward Queen's. On the way, he called the "house physician" and "surgical intensivist" on duty to "go up and see why [Mr. Barbee's] blood pressure fell." He also called his office manager to ask her to contact his "partner and Dr. Yu." Dr. Yarbrough testified that he parked at Queen's and immediately went to the operating room, where he made sure the room was set up for a second surgery on Mr. Barbee, the proper equipment to operate was in place, and that an anesthesiologist was ready. Dr. Yarbrough then went to P-7 around 9:00 p.m. and took Mr. Barbee to the operating room.

Dr. Yarbrough testified that during the second operation, he made a large incision, removed the blood that had bled into Mr.

5. Plaintiffs dispute whether Mr. Barbee's vital signs were taken at 4 p.m., and further contend that Mr. Barbee should have been assigned to a unit providing more frequent monitoring. Because we find that there was insufficient expert medical testimony on causation, *see* section V.C.3 *infra*, we do not address the issue of whether the Plaintiffs introduced sufficient evidence establishing negligence, and limit the factual background accordingly.

6. Dr. Yarbrough's expert witness, Ralph Victor Clayman M.D. (Dr. Clayman), testified at trial that a hemoglobin reading of three indicates "[s]evere anemia, likely incompatible with life." When asked if a "loss of blood based upon a hemoglobin reading of three [would] lead to multiple organ failure[,]" Dr. Clayman responded, "I believe so."

Barbee's abdomen since the first surgery, and then looked for the source of the bleeding. Dr. Yarbrough found "one small bleeder" on the large intestine. Dr. Yarbrough testified that the bleeder found during the second surgery was caused by the first surgery and most likely occurred when he had separated the colon from the body wall in order to remove the kidney. Dr. Yarbrough stated that the internal bleeding sustained by Mr. Barbee must have been "like a leaky faucet dripping, and it finally went to a point where he just crashed[.]"

Mr. Barbee was admitted to the surgical ICU after the second surgery, and was no longer under Dr. Yarbrough's care. Mihae Yu, M.D. (Dr. Yu), medical director of the ICU at Queen's, cared for Mr. Barbee in the ICU, and afterwards on the floor until Mr. Barbee was released. Dr. Yu testified that "if [Dr. Yarbrough] had not operated [the second time], the patient would have died." Mr. Barbee received between four and six units of blood the evening of the second surgery. Dr. Yu testified that Mr. Barbee's "post-operative course was complicated in the intensive care unit with adult respiratory distress syndrome, acute renal failure most likely from his hypotension and severe anemia, and he subsequently had a prolonged course and was able to be weaned off his ventilator support, but remained on hemodialysis." The two "major" complications Mr. Barbee suffered were "the kidney damage and the lung damage, of which he recuperated from both." However, Dr. Yu testified that after the second surgery, Mr. Barbee had to have a feeding tube placed in him. Dr. Yu further testified that Mr. Barbee required dialysis during his stay in the ICU and at the time of his discharge, and that she did not think Mr. Barbee was able to return to work.

Rustam, an attorney in Honolulu, testified that Mr. Barbee had suffered massive internal bleeding after the first surgery. Rustam testified that Mr. Barbee's condition improved sufficiently after the second surgery for him to be released to another floor, where Mr. Barbee received occupational therapy, physical therapy, and speech therapy. Mr.

Barbee was released to the Rehab Hospital of the Pacific (Rehab Hospital) in late September of 2001, where he was going to "build himself up 'cause his muscles had atrophied." After a couple of days in the Rehab Hospital, Mr. Barbee suffered a stroke, and was readmitted to the ICU at Queen's. Rustam observed that after the stroke, Mr. Barbee's "brain wasn't working; he couldn't speak well; he had palsy on one side of his face, ... [h]e was extremely sad because he knew he couldn't do what he could do before."

Mr. Barbee spent at least a week in the ICU, then was released to another floor at Queen's, and finally released again to the Rehab Hospital. Mr. Barbee spent less than a month at the Rehab Hospital where he again tried to learn to walk, use the restroom, and feed himself, and was making some progress learning to speak. Mr. Barbee was still on dialysis.

Rustam was questioned at trial regarding Mr. Barbee's overall condition following the two surgeries, and responded as follows:

Q. Did your father ever get to a point physically where he could live independently on his own?

A. Never.

Q. Was your father, for one reason or another having to do with failure of organs or respiratory problems, in and out of the hospital frequently?

A. From July 24, 2001, his organs were damaged as a result of the blood loss which led to his death.[7]

Finn testified that on October 16, 2001, Mr. Barbee was released from the Rehab Hospital and went to live with Rustam. Rustam testified that he remodeled the first floor of his Kāne'ohe home to make it handicap-accessible. Rustam hired a care service to help with meal preparation, assist Mr. Barbee with the restroom, do the laundry, and help Mr. Barbee with his physical therapy.

Finn testified that Mr. Barbee had been "doing fine" at home with Rustam, but suddenly during the first week of December "he started deteriorating[.]" Mr. Barbee was readmitted to Queen's on December 6, 2001,

---

7. Defense counsel did not object to or move to strike Rustam's testimony.

and discharged to the Rehab Hospital on December 14, 2001. Mr. Barbee was readmitted to Queen's on December 16, 2001, and remained there until February 22, 2002. Finn testified that Mr. Barbee again had to participate in occupational, physical, and speech therapy because "[h]e had deteriorated from the last time he'd been discharged from Queen's." Mr. Barbee was briefly readmitted to Queen's on February 24, 2002, most likely just to the emergency room. Mr. Barbee was again readmitted to Queen's on April 1, 2002. Finn testified that at that point, Mr. Barbee "was no longer able to walk or even try. He was silent most of the time ... [h]e was very, very weak." Mr. Barbee was discharged from Queen's on April 25, 2002 and appeared "even worse than he'd been before." Mr. Barbee was admitted to the emergency room on multiple occasions after his release in April.

Dr. Yu testified that in July of 2002, she diagnosed Mr. Barbee as having insufficient blood flow to part of his intestines, possibly a result of the small intestine having "twisted upon itself." As a result, Mr. Barbee developed gangrene, or septic shock on his small bowel, as well as cardio, respiratory, and renal failure. Dr. Yu removed part of Mr. Barbee's small intestine and connected a colostomy bag to Mr. Barbee.

Finn testified that Mr. Barbee remained in the ICU, "basically unconscious," for a month after the surgery on his small intestine. Mr. Barbee was discharged from Queen's on October 7, 2002. He was readmitted on October 14, 2002, and remained in Queen's until November 14, when he was flown home to Milwaukee, and admitted to St. Mary's Hospital (St. Mary's). Mr. Barbee remained in St. Mary's until he died on December 29, 2002. At St. Mary's, Mr. Barbee was under the care of Dr. Keane.

Daphne visited Mr. Barbee at St. Mary's on December 29, 2002. At that time "[Mr. Barbee] had a strange voice coming out, a strange sound, it sounded like a rattle, and then he had blood coming down his mouth ... both sides of his mouth[.]" Mr. Barbee

was taken to the ICU, where he died shortly thereafter.[8]

## B. Procedural Background

Plaintiffs' complaint alleged that Dr. Yarbrough was negligent: 1) in failing to advise Mr. Barbee that the surgery "was of a serious nature and that there was a very grave danger that [Mr. Barbee] would die or become incapacitated for the rest of [his] life as a result of such operation"; 2) in failing to advise Mr. Barbee that "if the operation were not performed, in all probability no harm would result to [him] for at least several years, unless the tumor mestastizised [sic] and spread"; 3) "[i]n ripping, tearing, or cutting the mesenteric artery, thus cutting off a great part of the blood supply to [Mr. Barbee's] brain, kidney and other organs during the first surgery"; 4) "[i]n failing to give, write or leave post operative orders to include checking vital signs for possible internal bleeding every hour for at least 12 hours after surgery in light of his knowledge that a mestentaric hemotoma [sic] occurred during the first surgery"; 5) "[i]n failing to return to [Queen's] in a prompt manner once being informed that his patient [Mr. Barbee] had complications or for not contacting another surgeon to perform the emergency medical repair in a timely manner"; and 6) "[i]n failing to inform [Mr. Barbee] that he had only performed two other laproscopic [sic] surgeries on live patients prior to July 24, [ ]2001."

Plaintiffs also alleged that Queen's was "vicariously liable for any breaches of the standard of care by its nurses or other employees" and "its agents and ostensible agents[.]"

Plaintiffs alleged that Dr. Younoszai and Queen's "were negligent in treating [Mr. Barbee] in that they failed to exercise the degree of skill and care in obtaining a qualified surgeon in a timely fashion who could perform an emergency operation to stop the blood loss due to internal bleeding[.]"

8. Mr. Barbee's death certificate was not received into evidence at trial, nor were his medical records from St. Mary's.

Plaintiffs alleged that "[a]s a proximate result of all of Defendants' negligence, [Mr. Barbee] subsequently suffered from anoxic encephalopathy, loss of kidney function requiring dialysis, scar tissue causing bowel obstructions requiring a second operation, incontinence, insertion of a g tube, feeding tubes for nourishment, became infected with [methicillin-resistant staphylococcus aureus (MRSA) ], and his ultimate death therefrom on December 29, 2002, in St. Mary's hospital in the City of Milwaukee, Wisconsin."

Plaintiffs claimed that as a result of Defendants' negligence, Mr. Barbee "was subjected to unnecessary pain and suffering and severe emotional distress[,]" that he "lost a substantial chance of survival[,]" and that his estate incurred medical bills in excess of $1 million.

Plaintiffs claimed that as a result of Dr. Yarbrough's negligence they were deprived "of the present value of the accumulations that [Mr. Barbee] would have made to the estate had [he] lived out his life expectancy[.]"

Plaintiffs further claimed that "as a proximate result of Defendants['] breach of their legal duties," they individually "suffered unnecessary and severe emotional distress, shock, agony and despair and will continue to suffer severe emotional distress, loss of [Mr. Barbee's] society, companionship, comfort, protection, attention, advice, counsel, guidance and paternal care and other compensable damages."

On September 29, 2004, the parties filed a Stipulation to Dismiss Defendant Barak Younoszai, D.O. and to Amend Caption Accordingly.[9] The stipulation provided that the claims against Dr. Younoszai were dismissed without prejudice. Subsequently, the circuit court entered an order which dismissed "all claims against [Queen's] regarding the care provided to Mr. Barbee by Dr. Younoszai" as well as claims that Mr. Barbee's development of a MRSA infection was due to the negligence of Queen's, and that Mr. Barbee's death was due to a MRSA infection.

On September 29, 2005, Queen's (later joined by Dr. Yarbrough) filed a motion for partial summary judgment. Queen's argued that because Plaintiffs were suing in their individual capacities rather than as legal representatives of Mr. Barbee's estate, Plaintiffs' claims for Mr. Barbee's lost earnings and wages, hospital bills accrued by Mr. Barbee and his estate, pain, suffering and emotional distress suffered by Mr. Barbee, and Mr. Barbee's loss of chance of survival must be dismissed. Queen's further argued that Plaintiffs' claim for loss of paternal care must be dismissed because none of the Plaintiffs was financially dependent on Mr. Barbee at the time of or during the five years prior to his death.

On November 28, 2005, the circuit court entered an Order Granting Defendant The Queen's Medical Center's Motion for Partial Summary Judgment and a Partial Judgment in Favor of Defendant The Queen's Medical Center, dismissing Plaintiffs' claims for Mr. Barbee's lost wages, hospital bills that accrued to his estate, pain, suffering and severe emotional distress suffered by Mr. Barbee, and Mr. Barbee's loss of chance of survival. Neither the order, nor the judgment, mention the claim for "loss of paternal care."

Thus, at the time of trial, the claims against remaining defendants Dr. Yarbrough and Queen's consisted of Plaintiffs' alleged suffering of "unnecessary and severe emotional distress" as well as "loss of [Mr. Barbee's] society, companionship, comfort, protection, attention, advice, counsel, guidance and paternal care and other compensable damages."

Trial took place from April 5, 2006 through April 20, 2006. On April 19, 2006, Defendants orally moved for judgment as a matter of law pursuant to Hawai'i Rules of Civil Procedure (HRCP) Rule 50. The court commented, "there is enough evidence in the record to take the case to the jury[,]" but "[i]t's the issue of causation that the court is wrestling with." Although the court "did not recall any testimony ... from the experts

---

9. The parties stipulated that "[i]n exchange for Plaintiffs' agreement to dismiss their claims against Dr. Younoszai, [Queen's] stipulates and agrees" that Dr. Younoszai was at all relevant times an agent/employee of Queen's, and that Queen's "will be bound by any finding or judgment which may be based upon the actions of Dr. Younoszai[.]"

regarding cause of death or causation," it observed that Rustam testified regarding causation "and there was no objection or attempt to strike it from the record so it is in evidence." The court took the matter under advisement and allowed the parties to further brief the issue of causation.

On April 24, 2006, the jury returned a special verdict in favor of Plaintiffs. The jury found Queen's 73% negligent, Dr. Yarbrough 27% negligent, and awarded $365,000 to each of the three Plaintiffs. On May 1, 2006, Defendants filed separate renewed motions for judgment as a matter of law. On May 12, 2006, Dr. Yarbrough filed a motion, in the alternative, for a new trial.

On June 6, 2006, after a hearing, the circuit court granted both Queen's and Dr. Yarbrough's renewed motions for judgment as a matter of law.[10] With regard to the issue of causation, the court observed:

> [T]he plaintiff argues ... that either there was sufficient evidence regarding the cause of death to go to the jury or that this case falls in the exception where expert testimony is not necessary because the cause of death is one that is within the common understanding and perception of a member of the general public.
>
> In this case, the unfortunate demise of Mr. Lloyd Barbee occurred not in the surgery room or in the recovery room, but instead, he passed away 18 months after the surgery. And during that course of time, there is not a complete record with respect to what, if anything, happened while Mr. Barbee was located on the mainland because he was located on the mainland for portions of that 18-month period. We also have evidence that Mr. Barbee was approximately 75 years of age, and there are suggestions that he had other health conditions that may or may not be involved with the conditions that brought about his demise.
>
> In any event, the court does not believe that the record supports the conclusion that this is a case in which lay persons are

competent to testify and offer opinions regarding cause of death.

> Turning to the question of whether there is expert evidence or expert testimony in the record regarding cause of death, the court is unable to find any evidence by a competent expert regarding cause of death of Mr. Lloyd Barbee.

On July 19, 2006, the circuit court entered the Judgment against Plaintiffs and on August 7, 2006, Plaintiffs filed a Notice of Appeal.

## C. The Circuit Court's Rulings Regarding Testimony of Plaintiffs' Expert Witness Dr. Bretan

Plaintiffs challenge rulings by the circuit court on pre-trial motions in limine seeking to limit Dr. Bretan's testimony, as well as rulings which the court made at trial. Accordingly, we will cover the background of those rulings in some detail.

Plaintiffs named Dr. Bretan as an expert witness in their pretrial disclosures. Dr. Yarbrough filed a motion in limine to limit Dr. Bretan's trial testimony on the grounds that Dr. Bretan failed to adequately explain the basis for his opinions regarding the cause of Mr. Barbee's death and the shortening of Mr. Barbee's life span when he was deposed. In his deposition, Dr. Bretan was questioned regarding the basis for his opinions as follows:

> [By counsel for Dr. Yarbrough] Q. How old was Mr. Barbee when he passed away?
>
> A. In his 70's, I believe. Mid 70's.
>
> Q. Do you know any more specifically than that?
>
> A. No, I can't recall the specifics of his death.
>
> Q. Do you know if an autopsy was done?
>
> A. I can't recall.
>
> Q. Have you reviewed the discharge summary from the institution where he was when he passed away?
>
> A. I don't believe so. I can't recall.

---

**10.** The circuit court also conditionally granted Dr. Yarbrough's Motion, in the Alternative, for a New Trial.

Q. Do you know if any physician in attendance at the institution where he passed away opined as to the cause of death?

A. I can't recall.

Q. Given Mr. Barbee's history of hypertension, was he statistically at risk of a reduced life expectancy?

A. I can't make that assessment.

Q. Given his history of diabetes, was he statistically at risk of a reduced life expectancy?

A. My understanding is that the diabetes and—was well-controlled, so I am not a person to make that assessment.

Q. Where did you gain understanding that his diabetes was well-controlled?

A. In terms of his preoperative consults for surgery itself.

Q. Are you able to quantify the decrease in Mr. Barbee's life span as a result of complications that may have occurred with the laparoscopic nephrectomy?

A. Yes, it's my opinion that his ultimate death was caused by the stress on his body, his reserves, from the injuries sustained around the hemorrhage and the hypotension.

Q. How long after the laparoscopic nephrectomy did Mr. Barbee pass away?

A. I can't recall.

Q. Do you know if it was within a month?

A. I believe it was measured in months, but I don't believe it was one month. I can't recall.

The circuit court granted in part and denied in part Dr. Yarbrough's motion in limine. The circuit court initially held that, at trial, Plaintiffs would be required to conduct voir dire outside the presence of the jury to "inquire if [Dr. Bretan], all of a sudden, has the foundation for opinions, how he acquired that foundation, in light of the deposition testimony." The circuit court also stated:

I'm not inviting Dr. Bretan to review any other material beyond what he had at the time of his deposition. So if, somehow, he overlooked information that he actually did have a basis for, the Court might allow him to testify. But the Court is not suggesting to Plaintiffs that he now go and do research and then come up with opinions regarding lifespan or cause of death. It has to be something that was overlooked and he neglected to disclose at the time of his deposition, that he already had information, and the information was not presented after his deposition to him or acquired by him after the deposition.

. . . .

[Counsel for Plaintiffs]: I guess what I'm saying is that that's not a new opinion. That's an opinion that he gave in his deposition and such. So I'm a little, you know, confused. I can see if he was to come up with some different answer or something; but that's not the case. He's given his opinion that the cause of death was the negligence stemming from the operation.

THE COURT: Well, there are some concerns, I guess, expressed by the movant that there are factors such as his other health conditions—diabetes and other things—that Dr. Bretan was not aware of. And, so, the question becomes, what, if any—or how reliable is Dr. Bretan's opinions if he did not have information regarding these other health conditions.

Then the court engaged in extensive colloquy with counsel for Plaintiffs and Defendants regarding whether and how Dr. Bretan was qualified to testify as to cause of death and shortened life span. With regard to shortened life span, the court observed "I'm not sure what that . . . has to do in a case where there's ultimately a death involved," and then ruled as follows:

So what the Court is going to do is grant the motion in part and deny the motion in part as follows:

The Court will grant the motion and exclude testimony regarding shortened lifespan. The Court will deny without prejudice opinions regarding cause of death. I think the defense is going to have to produce more to establish that this witness is not competent to testify as to cause of death.

Plaintiffs called Dr. Bretan as a witness at trial on the afternoon of Friday, April 7, 2006. Dr. Yarbrough had been testifying

that morning when the court recessed for lunch. When trial resumed at 1 p.m., counsel for Plaintiffs notified the court as follows:

[Counsel for Plaintiffs]: Good afternoon, Your Honor, and thank you.

We have a scheduling situation that I need to address with the Court about to give a heads up.

Our expert, Peter Bretan, a surgeon from California, has been waiting to testify. He has to leave tomorrow 'cause he has other engagements Monday on the mainland.

Consequently, I would request that we go as long as it takes today in order to finish him, after Dr. Yarbrough concludes.

THE COURT: How long is Dr. Bretan's direct testimony going to take?

[Counsel for Plaintiffs]: About an hour.

THE COURT: Can you do it in 45 minutes?

[Counsel for Plaintiffs]: We can certainly try.

THE COURT: Cross-examination how long?

[Counsel for Dr. Yarbrough]: If direct is 45 minutes, I could probably cross in 45 minutes.

If the Court will recall, though, there was an issue with respect to voir dire outside the presence of jury, and it was specifically related to the cause of death opinion.

This came up in the motion in limine, and I anticipated that, you know, we would be doing that, and that it would be a longer voir dire than usual.

That's ... I don't want to create any problems here schedulingwise [sic], but there's a jury expecting that we're concluding at the regular time.

THE COURT: Well, we are concluding at the regular time. The Court has a 3:00 calendar, but I'm wondering what arrangements were made between the parties with respect to Dr. Bretan testifying today?

[Counsel for Dr. Yarbrough]: We were just told that he was testifying, nothing beyond that.

[Counsel for Queen's]: That occurred yesterday when [Counsel for Plaintiffs] gave us today's witnesses.

THE COURT: [Counsel for Plaintiffs], I'm wondering why you didn't try to get Dr. Bretan on the stand earlier.

[Counsel for Plaintiffs]: We had to get Dr. Yu on, and that was at her request because of her surgery schedule.

That was relatively brief. We did not know that the examination of Dr. Yarbrough would be so lengthy. We thought that he was going to be examined as part of the defense case, rather than part of the plaintiff's [sic] case.

THE COURT: And what about Nurse Hong?

I mean, why did you allow Nurse Hong and Dr. Yarbrough to take up valuable time, knowing Dr. Bretan had to leave tomorrow?

[Counsel for Plaintiffs]: Well, 'cause Nurse Hong was relatively brief, and we did not know how long Dr. Yarbrough was going to go on.

I thought that he would conclude by lunch. Actually, we didn't know. I guess the time works out, but we didn't know we'd be concluding early for lunch today.

THE COURT: Why is it that, [Counsel for Dr. Yarbrough], why is it that you want to voir dire Dr. Bretan outside the hearing of the jury?

[Counsel for Dr. Yarbrough]: Your Honor, the issue came up in our motion in limine with respect to two issues. It was a short life expectancy and the cause of death, and you recall that Your Honor granted the motion with respect to life expectancy, denied without prejudice on cause of death, and it was Your Honor's suggestion, which I think was a good suggestion, that given the issues that were addressed in our motion in limine, that voir dire outside the presence of the jury might be appropriate.

THE COURT: Can Dr. Bretan come back later on in the case, because obviously, we're going into the third week.

. . . .

[Counsel for Plaintiffs]: I've spoken with Dr. Bretan, and he is [sic] a kidney transplant surgery, and he has a schedule that is full for the next month.

This matter was scheduled six months ago for him.

THE COURT: All right. Why don't we take Dr. Bretan. You will have until 1:45 to complete your direct examination.

If we get to the appropriate time to voir dire, that comes out of the 45 minutes.

Dr. Bretan testified that he was a private practice general urologist, as well as chief of transplants at the Northern California Kidney Transplant Program in Santa Rosa. After examining Dr. Bretan with regard to his education and experience, which included performing approximately 100 laparoscopic kidney removals, counsel for Plaintiffs moved to have Dr. Bretan qualified as an expert in "laparoscopic kidney surgery." The circuit court stated, "This Court does not qualify anyone to be an expert in any field. Request is denied." Plaintiffs' counsel asked several more background questions and then renewed the request to qualify Dr. Bretan as "an expert in his field," and the court said, "[c]ourt respectfully declines and denies the request to recognize [the] doctor as an expert."

Dr. Bretan testified that he had the opportunity to review Mr. Barbee's "whole medical records involved with his initial operation and subsequent operations." Dr. Bretan stated that the internal bleeding was caused by the Veress needle which "perforated tissues and injured arteries that contributed to subsequent bleeding[.]" He also testified that the injury caused by the Veress needle "requires steps to be taken [so] that delayed bleeding ... does not interfere permanently with the patient's subsequent health and possibly even longevity[,]" and that "those steps were not taken" in this case. Dr. Bretan testified that one of two hematomas observed during the first surgery was a "significant complication" and a "red flag" indicating a need for more frequent monitoring. While asking a follow-up question on how the hematomas occurred, counsel for the Plaintiffs was interrupted by the circuit court, which stated, "[T]ime is up. Cross-examination." Counsel for the Defen-

dants then conducted their respective cross-examinations.

On redirect, counsel for Plaintiffs asked Dr. Bretan about the implications of the loss of blood following the first surgery:

Q. The injuries and implications that Mr. Barbee suffered after the surgery, did they all stem from the loss of blood after the first surgery?

A. Yes. The subsequent injuries that the patient sustained, such as ischemia to the brain, acute renal failure are all consequence [sic] of severe sudden loss of blood volume and injury to organs because of that occurrence.

Q. And what effect did that have upon the patient, to the best of your-in your opinion, to the best of a reasonable medical probability?

A. Those injuries were severe, and they were ongoing.

In other words, the damage that was caused by the kidneys, the damage that was caused to the brain of this patient were ongoing and progressive.

Counsel for Plaintiffs ended his redirect and indicated that he would "like to make an offer of proof that we did not have time in the 45 minutes that we had originally to get into everything that we would like to get in. We have another half hour." The court stated that counsel could make his offer of proof "after the jury leaves," and the parties subsequently engaged in brief recross and further redirect examination of Dr. Bretan. During the time that Dr. Bretan testified, counsel for Plaintiffs did not attempt to voir dire Dr. Bretan outside the presence of the jury with regard to the foundation of his opinion regarding Mr. Barbee's death, nor did he attempt to elicit any specific training or experience which Dr. Bretan had in determining cause of death.

According to the transcript, examination of Dr. Bretan ended at 2:32 p.m., at which time cross-examination of Dr. Yarbrough resumed and continued until 3:02 p.m. At that time, counsel for Plaintiffs made an offer of proof, arguing that Dr. Bretan was only allowed to testify on direct for 45 minutes when there was half an hour left of trial time, and Plain-

tiffs "could have gotten in a few more items which were relevant to the case." Plaintiffs argued that they were therefore "prejudiced by not being able to ask certain questions with regard to consequence [sic] of the surgery and with regard to cause of death, with regard to the monitoring care and/or standards." The circuit court, after summarizing Dr. Bretan's education and professional experience, ruled as follows:

I did not hear one breath of experience [of Dr. Bretan] determining cause of death. In addition, there is no record regarding Dr. Bretan having any factual basis to make a determination regarding cause of death, because there were approximately 18 months between the time of the first surgery, and the time of Mr. Barbee's unfortunate demise.

So there is, in the Court's way of thinking, no basis for Dr. Bretan, either through qualification or factual basis, to provide any opinion regarding cause of death.

Moreover, the question of timing came into play for the first time today, at the 1:00 session when we reconvened after lunch, plaintiff raised with the Court the question of Dr. Bretan being present to testify today and planning to leave Honolulu tomorrow on Saturday.

The Court did ask if Dr. Bretan was able to reschedule his return to Honolulu to testify later in this case. We were advised that he was unable to do so because of his medical practice schedule.

We also had both Nurse Hong and Dr. Yu testify today, interrupting Dr. Yarbrough's testimony to take those two witnesses out of order, and at no time during the time we took those two witnesses out of order, did the Court hear one word about the possibility of having to take Dr. Bretan out of order to allow him to finish his testimony today, so that he could return to California tomorrow.

Therefore, under those circumstances, the Court made a determination that it would be appropriate to have Dr. Bretan testify today, and the Court inquired whether the plaintiff was able to complete Dr. Bretan's direct testimony in 45 minutes, and they indicated that they would

attempt to do so, and the Court asked the defense whether they would be able to conclude the cross-examination within 45 minutes. They indicated they would attempt to do so.

Under those circumstances, the Court imposed a 45-minute deadline upon the plaintiffs, and held the plaintiffs to that deadline. And in fact, gave them a few minutes beyond 45 minutes, because some of the time was taken up during voir dire by defense counsel for Dr. Yarbrough.

Under those circumstances, the Court did not believe it was fair to reopen direct examination with less than 20 minutes, less than 30 minutes remaining, because the— that would run the danger of having information brought out on the reopened direct, and not allowing the defendants to complete cross-examination on those reopened areas by the 3:00 deadline.

And the court did indicate it had a 3:00 calendar, which we are at this time imposing upon to take up this matter of Dr. Bretan.

So, therefore, for these and any other good cause shown in the record, the Court will maintain its ruling, and not permit any further testimony from Dr. Bretan.

On April 11, 2006, the circuit court, *sua sponte*, further clarified its ruling that Dr. Bretan was not qualified to testify as to cause of Mr. Barbee's death as follows:

This Court had concerns about Dr. Bretan's qualification to testify on the issue of cause of death, and there was no record made of Dr. Bretan having experience in analyzing and determining cause of death for a patient. Further, the record did not reveal that Dr. Bretan had considered or reviewed the records pertaining to Mr. Lloyd Barbee's health care from the time he left Hawaii until the time of his untimely demise. So, therefore, the Court maintained its ruling and still maintains its ruling that Dr. Bretan is not competent to testify and has not been qualified to testify as an expert in determining cause of death of a health care patient.

Plaintiffs' counsel asked to "make an offer of proof as to Dr. Bretan's qualifications and

his statements and his experience with regard to cause of death," and argued that Dr. Bretan had

[E]xperience with laparoscopic surgery, kidney removal surgery, he indicated he had done approximately a hundred of them, and, consequently, he has a lot of experience dealing with blood loss, dealing with the effects of hemorrhage and that any patient who loses that much blood is lucky to survive any length of time, but that the damage done to the organs by the loss of that much blood is indeed permanent and did indeed lead to Mr. Barbee's demise.

The circuit court responded as follows:

I understand that that is his testimony, but what the Court did not hear is Dr. Bretan's qualifications to testify as to cause of death. There's nothing in the record regarding his education, training or experience in determining cause of death; there's nothing to indicate he has experience as a pathologist or at any point in time in his career engaged in a determination of cause of death, and in this case the concern the Court has is the 17– or 18–month lapse of time between the time of the massive loss of blood and the time of his demise and other factors may have crept into the equation in terms of determining the death, I simply don't know, and I haven't heard enough in the record.

Had Mr. Barbee passed away on the 26th close in time to the massive loss of blood, I think it would be an easier question, but with the great passage of time, the Court requires further expertise to be shown in the record that a witness who is going to opine as to the cause of death would have to satisfy this Court's requirements.

## D. Relevant Rulings on Testimony by Dr. Keane

Dr. Keane was Mr. Barbee's long-time treating physician in Wisconsin. Prior to trial, Plaintiffs filed a pretrial statement, an amended pretrial statement, and second amended pre-trial statement identifying Dr. Keane as a "non-expert" witness who would testify as to Mr. Barbee's condition before surgery, "events at the hospital," and the "subsequent condition of and care needed for Mr. Barbee."

On January 11, 2006, Plaintiffs filed "Plaintiffs' Witness List" which identified Dr. Keane as a "non-expert witness" who would "testify as to the condition of [Mr.] Barbee's health before surgery, events at the hospital, subsequent condition of and care needed for [Mr.] Barbee, and [Dr. Keane's] review of medical records and opinion."

On March 24, 2006, Queen's filed a Motion In Limine No. 7, To Exclude Any Expert Testimony By Plaintiffs' Witness, Dr. Sean Keane. Queen's argued, inter alia, that because Plaintiffs did not identify Dr. Keane as an expert on their final naming of witnesses, Queen's elected not to depose Dr. Keane, and would thus be "clearly prejudiced" if Dr. Keane were allowed to testify as an expert. Dr. Yarbrough filed a similar motion on March 24, 2006.

Also on March 24, 2006, Plaintiffs filed a Motion In Limine No. 7 To Permit Sean Keane, M.D. To Give Lay Expert Opinion Testimony. The Plaintiffs argued that Dr. Keane had "knowledge of Mr. Barbee's medical condition prior to the July 24, 2001 surgery and observed his condition after the July 24, 2001 surgery[,]" and thus should be allowed to give "lay expert opinion testimony."

At the hearing on the motions, counsel for Plaintiffs conceded that Dr. Keane had been listed as a lay witness in pre-trial disclosures. The circuit court found that Dr. Keane could "testify as a lay witness, but not offer any expert opinions. He can talk about his observations, but nothing that requires any kind of medical training, experience, or skills."

At trial, Dr. Keane testified that he was an orthopedic surgeon and was Mr. Barbee's primary treating physician for orthopedic and non-orthopedic ailments for thirty-five years. Dr. Keane observed that prior to leaving for Hawai'i in July of 2001, Mr. Barbee "was in his usual good health."

Dr. Keane resumed treating Mr. Barbee after Mr. Barbee returned to Wisconsin in 2002. At that time, Mr. Barbee "looked like

a dying man." "[H]e looked gravely ill; ... his consciousness was somewhat clouded ... he was dementedly confused; ... he was barely able to stand and not able to walk[,]" and "[h]e had certainly lost weight at that stage." Mr. Barbee was no longer able to feed himself, clothe himself, or use the restroom by himself. Mr. Barbee showed "evidence of kidney failure, evidence of liver failure, evidence of what we would call shocked bowel syndrome ... and some of that would be enough to kill anybody, but Mr. Barbee was tougher, really, as a patient, but all of this was too much for him." Dr. Keane immediately admitted Mr. Barbee to St. Mary's in Milwaukee because Mr. Barbee "was gravely ill and he was dying."

Dr. Keane did not see Mr. Barbee on December 29, 2002, the day he passed away, but saw him on the 27th or 28th and observed his condition as "[s]teadily deteriorating." Dr. Keane also testified that a "[h]emoglobin of three indicates massive and catastrophic bleeding" and that "a patient would rarely survive that."

At a bench conference the following day, Plaintiffs requested that the circuit court permit them to recall Dr. Keane for the purpose of admitting into evidence three medical articles on multiple-organ failure. Plaintiffs argued that the treatises were admissible under Hawaii Rules of Evidence (HRE) Rule 803(18), contending that Dr. Keane testified that multiple-organ failure was the cause of Mr. Barbee's death, and that Dr. Keane relied on the learned treatises in treating Mr. Barbee for multi-organ system failure. The court denied Plaintiffs' request.

Counsel for Plaintiffs made an offer of proof, arguing that he laid a foundation for the introduction of the treatises by asking Dr. Keane to give his opinion regarding Mr. Barbee's cause of death, even though the question was objected to and the circuit court sustained the objection. Counsel for Plaintiffs also argued that Dr. Keane was "qualified as a lay expert to give lay expert opinion." Counsel for Plaintiffs further argued that "Dr. Keane was listed as [P]laintiffs' expert at the [Medical Claims Conciliation Panel (MCCP)] hearing. They've had his

report for over two years. They've always known he was the treating physician, and, consequently, there is no surprise to the [D]efendants."

## III. ISSUES ON APPEAL

Plaintiffs raise the following points of error on appeal:

(1) "The trial court erred in limiting the testimony of Dr. Bretan,"

(2) "The trial court erred in limiting the testimony of Dr. Keane," and

(3) "The trial court erred in granting judgement notwithstanding the jury verdict."

## IV. STANDARDS OF REVIEW

### A. Judgment Notwithstanding the Verdict/Judgment as a Matter of Law

According to the Hawai'i Supreme Court:

In *Nelson v. University of Hawai'i*, 97 Hawai'i 376, 392 n. 14, 38 P.3d 95, 112 n. 14 (2001), this court stated that:

HRCP Rule 50 was recently amended and no longer refers to motions for directed verdict or for [judgment non obstante verdicto (JNOV), i.e. judgment notwithstanding the verdict]. HRCP Rule 50 (2000). The new rule, consistent with the Federal Rules of Civil Procedure (FRCP) Rule 50 (as amended in 1991), refers to motions for "judgment as a matter of law," and motions made after trial are referred to as "renewed motions for judgment as a matter of law." ... The change in terminology in the 1993 amendment to HRCP Rule 50 was not intended to result in a substantive change of existing Hawai'i law.

This court further stated that "it is well settled that a trial court's rulings on motions for judgment as a matter of law are reviewed *de novo*." *Nelson*, 97 Hawai'i at 393, 38 P.3d at 112 (citing *In re Estate of Herbert*, 90 Hawai'i 443, 454, 979 P.2d 39, 50 (1999)). When reviewing a motion for judgment as a matter of law, "the evidence and the inferences which may be fairly drawn therefrom must be considered in the light most favorable to the nonmoving

party and the motion may be granted only where there can be but one reasonable conclusion as to the proper judgment." *Id.* (citing *Carr v. Strode*, 79 Hawai'i 475, 486, 904 P.2d 489, 500 (1995)).

*Kramer v. Ellett*, 108 Hawai'i 426, 430, 121 P.3d 406, 410 (2005) (brackets in original omitted).

## B. Qualification of an Expert Witness

HRE Rule 702 sets forth the requirements for qualification of an expert witness:

> **Testimony by experts.** If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise. In determining the issue of assistance to the trier of fact, the court may consider the trustworthiness and validity of the scientific technique or mode of analysis employed by the proffered expert.

 "[W]hether a witness qualifies as an expert is a matter addressed to the sound discretion of the trial court, and such determination will not be overturned unless there is a clear abuse of discretion." *Larsen v. State Sav. & Loan Ass'n,* 64 Haw. 302, 304, 640 P.2d 286, 288 (1982). "In applying [HRE Rule 702], the trial court must determine whether the expert's testimony is (1) relevant, and (2) reliable." *Ass'n of Apt. Owners of Wailea Elua v. Wailea Resort Co.,* 100 Hawai'i 97, 117, 58 P.3d 608, 628 (2002). "The trial court's relevancy decision under HRE 702 is reviewed *de novo* [.]" *State v. Keaweehu,* 110 Hawai'i 129, 137, 129 P.3d 1157, 1165 (App.2006). "The trial court's determination as to reliability is reviewed under the abuse of discretion standard." *Ass'n of Apt. Owners of Wailea Elua,* 100 Hawai'i at 117, 58 P.3d at 628.

## C. Admission of Expert Testimony

 "Generally, the decision whether to admit expert testimony rests in the discretion of the trial court. To the extent that the trial court's decision is dependant [sic] upon interpretation of court rules, ... such interpretation is a question of law, which this court reviews de novo." *Barcai v. Betwee,* 98 Hawai'i 470, 479, 50 P.3d 946, 955 (2002) (citations omitted).

## D. Motion for a New Trial

 Both the grant and the denial of a motion for new trial is within the trial court's discretion, and we will not reverse that decision absent a clear abuse of discretion. *Richardson v. Sport Shinko (Waikiki Corp.),* 76 Hawai'i 494, 503, 880 P.2d 169, 178; *see also Stahl v. Balsara,* 60 Haw. 144, 152, 587 P.2d 1210, 1215 (1978).... Unlike motions for a directed verdict or a JNOV, the movant need not, on a motion for new trial, convince the court to rule that no substantial evidence supports its opponent's case, but only that the verdict rendered for its opponent is against the manifest weight of the evidence. *Richardson,* 76 Hawai'i at 503, 880 P.2d at 178.

*Carr [v. Strode],* 79 Hawai'i [475,] 488, 904 P.2d [489,] 502 [ (1995) ]. "A ... court abuses its discretion whenever it exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party." *Abastillas v. Kekona,* 87 Hawai'i 446, 449, 958 P.2d 1136, 1139 (1998) (citations and internal quotation marks omitted).

In cases of conflicting evidence, the credibility of the witnesses and the weight to be given their testimony are within the province of the trial court and, generally, will not be disturbed on appeal. *See Steinberg v. Hoshijo,* 88 Hawai'i 10, 18, 960 P.2d 1218, 1226 (1998) (citation omitted). It is not the function of appellate courts to second-guess the trier of fact where there is substantial evidence in the record to support its conclusion. *See Krohnert v. Yacht Systems Hawaii, Inc.,* 4 Haw.App. 190, 197, 664 P.2d 738, 743 (1983).

*Stanford Carr Dev. Corp. v. Unity House Inc.,* 111 Hawai'i 286, 296–97, 141 P.3d 459, 469–70 (2006) (quoting *In re Estate of Herbert,* 90 Hawai'i 443, 454, 979 P.2d 39, 50 (1999)) (brackets in original omitted).

## E. Rulings on Admissibility of Hearsay

 "We apply two different standards of review in addressing evidentiary issues. Ev-

identiary rulings are reviewed for abuse of discretion, unless application of the rule admits of only one correct result, in which case review is under the right/wrong standard." *State v. Ortiz*, 91 Hawai'i 181, 189, 981 P.2d 1127, 1135 (1999) (internal quotation marks and citations omitted).

■ We apply the right/wrong standard of review to questions of hearsay:

The requirements of the rules dealing with hearsay are such that application of the particular rules can yield only one correct result. HRE Rule 802 (1993) provides in pertinent part that hearsay is not admissible except as provided by these rules. HRE Rules 803 and 804(b) (1993) enumerate exceptions that are not excluded by the hearsay rule. With respect to the exceptions, the only question for the trial court is whether the specific requirements of the rule were met, so there can be no discretion. Thus, where the admissibility of evidence is determined by application of the hearsay rule, there can generally be only one correct result, and the appropriate standard for appellate review is the right/wrong standard.

*Id.* at 189–90, 981 P.2d at 1135–36 (internal quotation marks, citation, footnote, and brackets omitted) (quoting *State v. Christian*, 88 Hawai'i 407, 418, 967 P.2d 239, 250 (1998)).

## F. Rulings on Motions in Limine

■ "The granting or denying of a motion in limine . . . is reviewed for abuse of discretion." *Miyamoto v. Lum*, 104 Hawai'i 1, 7, 84 P.3d 509, 515 (2004) (citation omitted). An abuse of discretion occurs if the trial court has "clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant." *Amfac, Inc. v. Waikiki Beachcomber Inv. Co.*, 74 Haw. 85, 114, 839 P.2d 10, 26 (1992).

## V. DISCUSSION

### A. The Circuit Court Did Not Abuse its Discretion in Limiting the Testimony of Dr. Bretan

Plaintiffs argue that the circuit court "erred in limiting the testimony of Dr. Bre-

tan[.]" First, Plaintiffs argue that the circuit court offered "no explanation" for its in limine ruling "prohibiting Dr. Bretan from testifying about Mr. Barbee's diminished lifespan, but not as to cause of death." Second, the Plaintiffs argue that "[a]t trial, the [c]ourt indicated it would not recognize any witness as an expert[,]" which "demonstrated a clear hostility to Plaintiffs and Dr. Bretan." Third, Plaintiffs argue that the circuit court should have allowed Dr. Bretan to testify without objections and interruptions. Fourth, "[t]he [c]ourt also limited Plaintiff[s'] examination of Dr. Bretan to 45 minutes, even though there was a half hour of court time remaining," and "[n]o such limitations were placed on the Defendant[s'] out of state expert witness testimony."

We conclude that the circuit court did not abuse its discretion in its rulings on Dr. Bretan's testimony or that any error was harmless.

### 1. The Circuit Court Did Explain its Reasoning for Precluding Dr. Bretan from Testifying as to Shortened Life Span, and Conditionally Allowing Him to Testify as to Cause of Death

Contrary to Plaintiffs' contention, the circuit court did explain why Dr. Bretan would not be permitted to testify as to the shortening of Mr. Barbee's life span, but would conditionally be permitted to testify as to the cause of Mr. Barbee's death. Given Dr. Bretan's deposition testimony, in which Dr. Bretan stated, inter alia, that he could not recall how long after the laparoscopic surgery Mr. Barbee died, did not recall whether an autopsy had been done, and did not believe he had reviewed the discharge summary from St. Mary's, the court was concerned about the adequacy of the foundation for Dr. Bretan's opinions. Additionally, the court questioned the relevancy of the testimony on shortened life span "in a case where there's ultimately a death involved." Although the circuit court granted the motion to preclude Dr. Bretan's testimony regarding shortened life span, the circuit court held that Dr. Bretan could testify as to cause of death if Plaintiffs estab-

lished a sufficient foundation based on information that Dr. Bretan was aware of, but had "overlooked," at the time of his deposition.[11]

■ To the extent that Plaintiffs are suggesting that the circuit court erred in limiting Dr. Bretan's testimony as to the shortening of Mr. Barbee's lifespan, they have not provided any meaningful argument on that issue and accordingly, we may deem the issue waived. Hawai'i Rules of Appellate Procedure (HRAP) Rule 28(b)(7); *Taomae v. Lingle*, 108 Hawai'i 245, 257, 118 P.3d 1188, 1200 (2005) (observing that the appellate court may "disregard [a] particular contention" if the appellant "makes no discernible argument in support of that position") (citation omitted). In any event, even assuming arguendo that the limitation was erroneous, any error was harmless. The question of whether Mr. Barbee's life span had been shortened by Defendants' alleged negligence was closely related to the question of whether Defendants' alleged negligence was a cause of his death, a topic about which the circuit court did not preclude testimony by Dr. Bretan if Plaintiffs could establish a sufficient foundation for it at trial. Indeed, absent sufficient expert medical testimony establishing that Defendants' negligence was a legal cause of Mr. Barbee's death, *see* section V.C.3 infra, testimony regarding the extent to which his life was thereby shortened would not be relevant. Since, as we discuss in section V.C.3 infra, the Plaintiffs did not provide such expert medical testimony at trial, any error with regard to the shortening of Mr. Barbee's lifespan was harmless.

**2. The Circuit Court Did Not Express Hostility Toward Plaintiffs**

■ The circuit court denied Plaintiffs' requests to qualify Dr. Bretan as an expert. The circuit court also denied Plaintiffs' request to qualify Nurse Carol Best as an expert, stating, "Inasmuch as this Court does not comment on the evidence and announce whether or not a particular witness is qualified as an expert in a particular field, the Court respectfully denies the request." However, Plaintiffs have failed to establish that the court's refusal to qualify the Plaintiffs' experts stemmed from hostility toward the Plaintiffs or Plaintiffs' witnesses. Rather, it appears that it was the circuit court's practice to not make findings before the jury as to the qualifications of any expert witnesses.[12] Although the record on appeal does not contain an explanation of that practice, we note that the parties signed a pretrial conference order dated March 14, 2006 which states as follows under "other topics": "Expert witnesses (no need to qualify)." Also, Defendants did not move the circuit court to qualify any of their witnesses as experts. Moreover, the circuit court ruled in limine that Dr. Bretan was not precluded from giving expert testimony as to cause of death at trial, but that Plaintiffs would need to establish a sufficient foundation for his opinion at that time. Thus, although there is nothing in the record explaining the court's approach toward qualifying expert witnesses,

---

**11.** In their reply brief to Dr. Yarbrough's answering brief, Plaintiffs argue that the circuit court wrongfully granted the motion in limine because "Dr. Bretan was qualified to testify of cause of death." However, it is clear from the record that the circuit court did not rule in limine that Dr. Bretan could not testify as to cause of death. Rather, the circuit court ruled that Plaintiffs would have to voir dire Dr. Bretan outside the presence of the jury to establish a basis upon which to opine as to Mr. Barbee's cause of death. It was only after Plaintiffs had an opportunity to develop such a basis during their examination of Dr. Bretan at trial, but failed to do so, that the circuit court found that Dr. Bretan was not qualified to testify as to cause of death.

**12.** Some appellate courts and commentators have expressed concern about trial courts making findings in front of juries about the qualification of witnesses to testify as experts. *See, e.g., United States v. Johnson*, 488 F.3d 690, 697–98 (6th Cir.2007) (observing that "[w]hen a court certifies that a witness is an expert, it lends a note of approval to the witness that inordinately enhances the witness's stature and detracts from the court's neutrality and detachment.... Instead, the proponent of the witness should pose qualifying and foundational questions and proceed to elicit opinion testimony. If the opponent objects, the court should rule on the objections, allowing the objector to pose voir dire questions to the witness's qualifications if necessary and requested."); 29 Charles Alan Wright & Victor James Gold, *Federal Practice and Procedure*, at 261 (1997).

it does not appear that the court was singling out Plaintiffs in applying its policy or expressing hostility toward them, or their witnesses. Nor can we say from the record before us that the circuit court's approach to qualifying expert witnesses constituted an abuse of discretion.

█ In reaching that conclusion, we do not suggest that the circuit court was required to take the approach which it took, but rather that it was not an abuse of discretion for it to do so. While the concerns identified in note 12 *supra* are legitimate, they can also be addressed by other means, such as by giving cautionary instructions to the jury regarding the weight to be given to testimony by expert witnesses. *See United States v. Hawley*, 562 F.Supp.2d 1017, 1036 (N.D.Iowa 2008) (noting, with regard to concerns about a court referring to a witness as an expert, that "such potential prejudice can be avoided by instructing jurors on the way in which they are to determine what weight to give to a purported 'expert's' opinion") (citation omitted). Such instructions are consistent with the principle that "[o]nce the basic requisite qualifications are established, the extent of an expert's knowledge of the subject matter goes to the weight rather than the admissibility of the testimony." *Larsen*, 64 Haw. at 304, 640 P.2d at 288 (citations omitted); Commentary to HRE Rule 702 ("The trier of fact may nonetheless consider the qualifications of the witness in determining the weight to be given to the testimony.") (citation omitted).

### 3. Plaintiffs Provide No "Discernable Arguments" for Why Dr. Bretan Should Have Been Allowed to Testify Without Objections or Interruptions

Plaintiffs further argue that "Dr. Bretan should have been allowed to testify fully on cause of death without the many objections and interruptions." However, Plaintiffs failed to provide any citation to the record or present any discernible argument in support of this contention, and accordingly we deem it waived. HRAP Rule 28(b)(7); *Taomae*, 108 Hawai'i at 257, 118 P.3d at 1200 (citation omitted).

### 4. The Circuit Court Did Not Abuse its Discretion in Declining to Reopen Direct Testimony of Dr. Bretan

█ Lastly, Plaintiffs argue that "the Court also limited Plaintiff[s'] examination of Dr. Bretan to 45 minutes, even though the[re] was a half hour of court time remaining. No such limitations were placed on Defendant[s'] out of state expert witness testimony."

█ The Hawai'i Supreme Court has held that a court has "the authority to set a reasonable time limit for trials and hearings." *Doe v. Doe*, 98 Hawai'i 144, 154, 44 P.3d 1085, 1095 (2002). This is because courts "have inherent equity, supervisory, and administrative powers as well as inherent power to control the litigation process before them." *Id.* at 154–55, 44 P.3d at 1095–96 (quotation omitted); *see* HRE Rule 611. Other jurisdictions have found that this includes the discretion to impose a time limit on a plaintiff's direct testimony. *See Walton v. Canon, Short & Gaston*, 23 S.W.3d 143 (Tex.App. 2000) (trial court did not abuse its discretion in requiring that each party present its case in one-and-a-half hours each where the parties had estimated they would only need a half-day trial, did not object when the court advised them of the time limitation at the start of trial, and appellant did not explain the evidence he was allegedly prevented from introducing). However, the trial court's discretion "is not unlimited ... and must be balanced against the rights of the parties to present their cases on the merits." *Doe*, 98 Hawai'i at 155 n. 12, 44 P.3d at 1096 n. 12 (family court abused its discretion in a child custody proceeding by denying Mother's motion to reopen proceedings to receive additional testimony, based solely on the fact that the court's self-imposed three-hour time limit had expired, when exclusion bore on the issue of family violence and the best interests of the child).

In this case, the circuit court did not abuse its discretion in declining to reopen direct examination of Dr. Bretan during the remaining 30 minutes of trial on April 7, 2006. We evaluate that ruling in the context of the events which preceded it on that day. The circumstances which caused the circuit court

to initially limit the length of Dr. Bretan's direct testimony to 45 minutes were of Plaintiffs' own making. Counsel for Plaintiffs did not notify the other parties or the circuit court until 1:00 p.m. that Dr. Bretan could only testify that day. Dr. Bretan could have begun his testimony during the morning session if Plaintiffs had raised the issue sooner, since the witnesses that morning included Dr. Yarbrough, who was a party, and Nurse Hong, who was a local witness. Faced with these circumstances, the circuit court explored alternatives by asking if Dr. Bretan could return to Honolulu to testify later on in the case, which he could not do. Plaintiffs' counsel advised the court that Plaintiffs would need "[a]bout an hour" for direct examination, but added that they "can certainly try" to complete it in 45 minutes. Counsel for Dr. Yarbrough similarly indicated he could complete cross-examination in 45 minutes. In these circumstances, the circuit court's initial decision limiting Plaintiffs' direct examination of Dr. Bretan to 45 minutes was not an abuse of discretion.

Nor was it an abuse of discretion for the circuit court to decline to allow Plaintiffs to reopen their direct examination of Dr. Bretan when it turned out that about 30 minutes remained after the direct, cross and redirect examination of Dr. Bretan had been completed. The circuit court concluded that reopening direct testimony when there was a half hour left of trial might prejudice Defendants by not allowing them adequate time to cross-examine Dr. Bretan on any new testimony he offered during that time. That was a legitimate concern. Based on the court's rulings on the motions in limine, Plaintiffs were required to voir dire Dr. Bretan outside the presence of the jury to establish a foundation for his opinions regarding causation.[13] That process alone, together with any voir dire by defense counsel on that issue, could reasonably have been expected to consume a significant portion of the 30 minutes. Similarly, the questions needed to establish Dr. Bretan's qualifications to offer an opinion on cause of death, given that the death in this case occurred 17 months after the alleged

negligence, would likely have consumed significant time.

Considering all of the circumstances, we cannot say that the circuit court "clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant" in refusing to reopen Dr. Bretan's direct examination. *Amfac, Inc.*, 74 Haw. at 114, 839 P.2d at 26.

Plaintiffs' suggestion that the circuit court abused its discretion in not placing similar time restrictions on Dr. Clayman, who was Defendants' out-of-state expert witness, is without merit, since the circumstances that led the court to place time restrictions on the examination of Dr. Bretan did not arise with regard to Dr. Clayman.

### B. The Circuit Court Did Not Err in Limiting the Testimony of Dr. Keane

Plaintiffs argue that the circuit court "erred in limiting the testimony of ... Dr. Keane" because Dr. Keane was "Mr. Barbee's treating physician in Wisconsin for 35 years" and "at the time of his death[,]" and should have been allowed to testify as to Mr. Barbee's cause of death. Plaintiffs further argue that the circuit court erred when it "refused to allow Dr. Keane to testify on Learned Treatises concerning bodily injury from blood loss resulting in multiple organ failure and death." However, for the following reasons, the circuit court properly limited Dr. Keane to lay testimony and denied Plaintiffs' request to reopen his direct testimony for the purposes of introducing three learned treatises.

#### 1. Dr. Keane Was Listed as a Lay Witness and it Would Have Been Prejudicial to Allow Him to Give Expert Testimony

Plaintiffs argue that Dr. Keane's testimony was "improperly limited" because Defendants "had ample notice" of Dr. Keane's proposed expert testimony but "decided not to depose Dr. Keane on their own accord." Specifically, Plaintiffs argue that Defendants had notice of Dr. Keane's proposed expert

---

13. Counsel for Dr. Yarbrough reminded the court and counsel of that ruling before Plaintiffs' counsel began his direct examination of Dr. Bretan.

testimony because Dr. Keane was listed as a witness in all pretrial disclosures, Dr. Keane was Mr. Barbee's "treating physician," Plaintiffs provided Defendants with an opinion letter and declaration from Dr. Keane containing opinions on causation and breach of the standard of care, and Dr. Keane "testified at the MCCP hearing."

The Hawai'i Supreme Court has held that "complete and accurate pretrial discovery of expert witnesses is critical to a fair trial[.]" *Barcai*, 98 Hawai'i at 481, 50 P.3d at 957 (citation omitted). Moreover, "HRCP [Rule] 26 is designed to promote candor and fairness in the pretrial discovery process and to eliminate surprises at trial." *Lee v. Elbaum*, 77 Hawai'i 446, 454, 887 P.2d 656, 664 (App.1993). Pretrial disclosure of expert witnesses is necessary because "[e]ffective cross-examination of an expert witness requires advance preparation." *Id.* (quoting Fed.R.Civ.P. 26, Advisory Committee Note of 1970 to Amended Subdivision (b)).

Plaintiffs did not identify Dr. Keane as an expert witness in their Pretrial Statement, their Amended Pretrial Statement, their Second Amended Pretrial Statement, their response and supplemental response to Dr. Yarbrough's first request for answers to interrogatories, and in their final naming of witnesses submitted on January 11, 2006. Because Dr. Keane was never identified as an expert by Plaintiffs, Defendants were not on notice that Dr. Keane would testify as an expert in this trial. Rather, Defendants reasonably relied on Plaintiffs' disclosures in deciding not to depose Dr. Keane. Therefore, it would have been unfairly prejudicial to Defendants to allow Dr. Keane to testify as an expert at trial.

Although the Plaintiffs cite *Ginsberg v. St. Michael's Hosp.*, 292 N.J.Super. 21, 678 A.2d 271 (App.Div.1996), in support of the proposition that a treating physician identified in pretrial disclosures as a lay witness may be allowed to testify as an expert at trial, *Ginsberg* is distinguishable from the facts at issue here. In *Ginsberg*, a treating physician prepared a death certificate but did not list as a cause of death his opinion that an "[insulin] overdose caused a cascade of other events

that killed [the decedent]." *Id.* at 274. At trial, the physician was not permitted to testify as to his opinions regarding the decedent's cause of death because he had not been listed as an expert witness. *Id.* at 277. The appellate court found the exclusion to be reversible error because, unlike the circumstances here, the treating physician had been deposed regarding his opinion prior to trial. *Id.* Moreover, at trial, the defense was permitted to rely on the death certificate prepared by the treating physician to support its position that an insulin overdose was not a cause of death, but the treating physician "was not permitted to explain how he came to th[e] conclusions [listed on the certificate]." *Id.*

## 2. The Circuit Court Did Not Abuse its Discretion in Not Allowing Plaintiffs to Recall Dr. Keane to Testify as to Three Scientific Articles

At trial, Plaintiffs sought to reopen the direct examination of Dr. Keane for the purposes of introducing three medical articles, two of which discuss the mortality rate of patients suffering from multiple-system organ failure. The third article "ha[d] to do with the definition of a radical nephrectomy."

Dr. Keane did not testify that he had relied on any of the articles in assessing Mr. Barbee's condition. As discussed supra, Dr. Keane was not identified as an expert witness, and the circuit court did not abuse its discretion in limiting Dr. Keane to lay testimony. Accordingly, we agree with the circuit court's assessment that "[r]eopening the testimony to allow Dr. Keane to testify regarding multiple-organ system failure and cause of death would be allowing Dr. Keane to offer expert opinions that are not within the common understanding of persons on the street, [and] therefore would fall within the realm of expert testimony."

Moreover, contrary to Plaintiffs' contention, HRE Rule 803(b)(18) does not allow "Learned Treatises to be submitted into evidence in medical malpractice cases[,]" but allows for admission "[t]o the extent called to the attention of an expert witness upon cross-examination" or "relied upon by the witness in direct examination[.]" HRE Rule

803(b)(18) (1993). There is nothing in the record to indicate that either of these two circumstances was met in this instance.[14]

Thus, the circuit court did not err in declining to reopen the direct testimony of Dr. Keane to allow Plaintiffs to introduce these medical articles.

## C. The Circuit Court Did Not Err in Granting the Renewed Motions for Judgment as a Matter of Law

Plaintiffs argue that the circuit court erred in granting Defendants' renewed motions for judgment as a matter of law because they "proved by the preponderance of the evidence the cause of death using multiple expert witnesses and documents." First, Plaintiffs argue that Mr. Barbee's cause of death was within the sphere of "common knowledge," thus obviating the need for expert testimony. Second, Plaintiffs assert that "[e]ven if the cause of death is not obvious," Rustam provided expert testimony on cause of death. Third, Plaintiffs contend that "numerous witnesses supported Rustam Barbee's statement regarding cause of death, providing significantly 'more than a mere scintilla' of evidence." Fourth, Plaintiffs argue in the alternative that they "proved by a preponderance of the evidence medical causation under the 'loss of chance' doctrine."

■ At oral argument, counsel for Plaintiffs suggested that Plaintiffs could recover damages for emotional distress without proving the cause of Mr. Barbee's death. However, we do not address that argument here because we conclude that it was waived by Plaintiffs. In their briefs on appeal, Plaintiffs did not identify that issue in their points of error, nor did they argue it. *See* HRAP Rule 28; *Zane v. Liberty Mut. Fire Ins. Co.,* 115 Hawai'i 60, 76 n. 16, 165 P.3d 961, 977 n. 16 (2007) ("it goes without saying that legal grounds raised for the first time in oral argument before the court of last resort are late to the dance"); *Houghtailing ex rel. Steere v. De La Nux,* 25 Haw. 438, 444 (1920); *Hana Ranch, Inc. v. Kaholo,* 2 Haw.

App. 329, 332–33, 632 P.2d 293, 295–96 (1981).

Moreover, Plaintiffs did not argue that theory of recovery in their written response to Defendants' renewed motions for judgment as a matter of law in the circuit court, or in their oral arguments to the circuit court on those motions. Rather, their arguments were focused on whether they had presented sufficient evidence of the cause of Mr. Barbee's death. Because they did not raise this issue in the circuit court in response to the motions, we will not consider it on appeal. *See, e.g., Ass'n of Apartment Owners of Wailea Elua,* 100 Hawai'i at 107–08, 58 P.3d at 618–19 ("Legal issues not raised in the trial court are ordinarily deemed waived on appeal.") (citations omitted).

Thus, we focus exclusively on whether Plaintiffs provided sufficient proof to establish that the alleged negligence of Defendants was the cause of Mr. Barbee's death. Because we conclude they did not, the circuit court did not err in granting Defendants' renewed motions for judgment as a matter of law.

### 1. Plaintiffs Were Required to Establish Causation By Expert Medical Testimony, as the "Common Knowledge" Exception Was Inapplicable

■ This court has held that "the plaintiff in a medical malpractice case based on negligent treatment has the burden of establishing a duty owed by the defendant to the plaintiff, a breach of that duty, and a causal relationship between the breach and the injury suffered." *Bernard v. Char,* 79 Hawai'i 371, 377, 903 P.2d 676, 682 (App.1995) (citing 4 F. Lane, *Lane Medical Litigation Guide* § 40.14, at 54 (1993)), *aff'd,* 79 Hawai'i 362, 903 P.2d 667 (1995). Further, in a medical malpractice case, a plaintiff must establish proximate or contributory causation through the introduction of expert medical testimony. *See Devine v. Queen's Medical Center,* 59 Haw. 50, 52, 574 P.2d 1352, 1353 (1978); *Craft v. Peebles,* 78 Hawai'i 287, 305, 893 P.2d 138, 156 (1995); *Phillips v. Queen's Medical Center,* 1 Haw.App. 17, 18, 613 P.2d 365, 366

---

14. Although Dr. Clayman, an expert for Dr. Yarbrough who testified seven days after Dr. Keane, indicated he had been familiar with one of the articles twenty years ago, Plaintiffs neither elicited further testimony on the article nor attempted to introduce it at that time.

(1980) (summary judgment proper where plaintiff introduced "no expert medical testimony to link the cause of death to the insufficiencies complained of").

*Devine* involved allegations of negligence similar to some of those made by Plaintiffs here. The plaintiff's husband (decedent) had undergone a surgical procedure at Queen's, and, after spending a few days in the surgical intensive care unit, was transferred to a "secondary cardiac surgical care facility." 59 Haw. at 51, 574 P.2d at 1353. While in that facility, the decedent died of a pulmonary embolism. The plaintiff alleged that the defendants had been negligent in placing "a seriously ill cardiac patient in a general hospital room...." *Id.* In response to a motion for summary judgment, the plaintiff did not provide any expert medical testimony. The supreme court affirmed the grant of summary judgment, noting that "the record fails to reveal that the post-operative care and conduct of the defendants towards the plaintiff's decedent was a proximate or contributory cause of his death from pulmonary embolism. Expert medical testimony, under the circumstances, was required to establish this essential element of the plaintiff's case." *Id.* at 51–52, 574 P.2d at 1353 (citations omitted).

In *Craft*, the supreme court considered the nature of the expert medical testimony that must be provided by a plaintiff in order to establish causation, noting:

> That opinion, however, must be based on reasonable medical probability. *See McBride v. United States*, 462 F.2d 72, 75 (9th Cir.1972) (In a medical malpractice action, a plaintiff must show with reasonable medical probability a causal nexus between the physician's treatment or lack thereof and the plaintiff's injury.); *Duff v. Yelin*, 721 S.W.2d 365 (Tex.App.1986) (The opinion testimony of a medical expert providing the causal nexus must be grounded upon reasonable medical probability as opposed to a mere possibility because possibilities are endless in the field of medicine.).

78 Hawai'i at 305, 893 P.2d at 156.

Hawai'i does recognize a "common knowledge" exception to the requirement that a plaintiff must introduce expert medical testimony on causation. *Medina v. Figuered*, 3 Haw.App. 186, 188, 647 P.2d 292, 294 (1982). The exception is similar to the doctrine of res ipsa loquitur, and when applied, transforms a medical malpractice case "into an ordinary negligence case, thus obviating the necessity of expert testimony to establish the applicable standard of care." *Craft*, 78 Hawai'i at 298, 893 P.2d at 149 (citing *Rosenberg by Rosenberg v. Cahill*, 99 N.J. 318, 492 A.2d 371, 374 (1985)). This exception is "rare in application," *id.*, and applies in instances such as "[w]hen an operation leaves a sponge in the patient's interior, or removes or injures an inappropriate part of his anatomy, or when a tooth is dropped down his windpipe or he suffers a serious burn from a hot water bottle, or when instruments are not sterilized[.]" *Id.* (citing *Medina*, 3 Haw.App. at 188, 647 P.2d at 294).

Plaintiffs argue that this case "did not require expert testimony because any lay person can easily grasp the concept that a person dies from losing so much blood that multiple organs fail to perform their functions." Mr. Barbee's death was thus not "of such a technical nature that lay persons are incompetent to draw their own conclusions from facts presented without aid" of expert testimony. However, the Plaintiffs are incorrect in asserting that expert testimony was not necessary because, as the discussion in *Craft* and the case law from other jurisdictions indicates, Mr. Barbee's cause of death was not within the realm of common knowledge.

In *Risko v. Ciocca*, 356 N.J.Super. 406, 812 A.2d 1138 (App.Div.2003), for example, the plaintiff appealed from a judgment dismissing the complaint against the defendants for failure to file an "affidavit of merit." *Id.* at 1139. New Jersey law requires the filing of such an affidavit "to insure that a plaintiff would be able to produce expert testimony that the defendant breached a duty of care before compelling the doctor to defend." *Id.* at 1140. No affidavit is required, however, in a case where "a jury could use 'common knowledge' to decide whether the defendant was negligent." *Id.*

The plaintiff's wife (decedent) was admitted to the hospital with a diagnosis of carotid stenosis, or an abnormal narrowing of the carotid artery. *Id.* at 1139. She was sixty-four years old and had a history of hypertension and coronary artery disease. *Id.* at 1139–40. On October 16, 1998, defendant Dr. Ciocca performed a right carotid endarterectomy (removal of the thickened or damaged inner lining of a carotid artery) on the decedent, and she was released on October 19, 1998. *Id.* at 1140. Within hours of her discharge, the decedent's neck began to swell, and she went into cardiac arrest in the ambulance on the way to the hospital. *Id.* At the hospital, defendant Dr. Crowley reopened the site of the endarterectomy, and, similar to the present case, "evacuated" an "expanding hematoma," which was not present at the time of her discharge. *Id.* The decedent remained in the ICU for a month, where at some point she suffered a stroke. *Id.* The decedent gradually improved and was discharged "to rehab" on December 4, 1998, at which time her diagnosis included respiratory failure, central nervous system complications, congestive heart failure, and hypertension. *Id.* The decedent died on September 25, 1999, almost one year after the initial surgery. *Id.*

The plaintiff alleged that the "leaking endarterectomy" was the cause of the decedent's "stroke and subsequent history" resulting in her death, but offered no evidence about "the circumstances of her death." *Id.* The plaintiff argued on appeal that the "common knowledge" doctrine obviated the need for an affidavit identifying an expert opinion on the cause of death. *Id.* at 1139. The motion judge found as follows:

> As I said, I've indicated the hemotomin [sic] complexities involved and its development is not a subject of lay jury's [sic] common knowledge. It's evidenced that the explanation of the cause or the development of the hemotomin [sic] is not a suitable matter for a layman to opine from without the guidance of expert testimony. And it was not within the common knowledge of a jury as plaintiff asserts. The facts of this case are different from a simple mistake of pulling the wrong teeth

and the mistake of misreading the results of a pregnancy test.

*Id.* at 1141 (corrections in original).

The superior court affirmed, finding that the "common knowledge" doctrine did not apply and expert testimony was necessary to show both breach of duty and proximate causation. *Id.*

In *Sherman v. Bristol Hospital, Inc.*, 79 Conn.App. 78, 828 A.2d 1260, 1262 (2003), the plaintiff, who was obese and had a history of heart problems, underwent wrist fusion surgery. Following surgery, the plaintiff was prescribed morphine for "intense pain." *Id.* at 1263. When the nurse checked on the plaintiff at 4 a.m., he was grayish in color and unresponsive. *Id.* The nurse summoned the physician on duty, who administered a drug to reverse the effects of the morphine, but the plaintiff's condition did not improve. *Id.* The physician determined that the plaintiff had suffered a heart attack and had congestive heart failure. *Id.*

The plaintiff alleged that the defendant hospital and nurse knew or should have known about his obesity and heart problems and that morphine has a depressive effect on the cardiac and pulmonary systems. *Id.* The plaintiff further alleged that in light of the defendant's knowledge of these factors, "the standard of care required that they monitor him much more frequently than they would other patients to assess the effect that the morphine was having on him." *Id.* The plaintiff also claimed that defendants "failed to monitor him for a four hour period, which constituted a breach of the standard of care that caused him to suffer injuries." *Id.*

The court determined that plaintiff's expert witness, an advanced practice registered nurse, could testify as to the standard of care, but that she did not possess the experience or training necessary to testify as to issues of causation. *Id.* at 1263–64. The court then granted the defendants' motion for summary judgment on grounds that the plaintiff did not present expert testimony as to causation. *Id.* at 1264. The plaintiff appealed, arguing, inter alia, that summary judgment was incorrectly granted because expert testimony was not required on the issue of causation. *Id.* at 1266. Although

the court recognized that "[a]n exception to the general rule with regard to expert medical opinion evidence is when the medical condition is obvious or common in everyday life," the court found that "[t]he effect that morphine might have on a patient with a heart condition is not an obvious one," thereby requiring expert testimony on the plaintiff's allegation that the defendants' failure to monitor the effect of the morphine on the plaintiff caused him to suffer a heart attack and congestive heart failure. *Id.* at 1267.

In *Gibson v. Weber*, 433 F.3d 642 (8th Cir.2006), a state prisoner brought an action against "state correctional officials and outside medical personnel alleging deliberate indifference to his medical needs and inadequate medical facilities," in violation of state law and the Eighth and Fourteenth Amendments. *Id.* at 644. The district court granted summary judgment in favor of all of the defendants on the plaintiff's federal claims and declined to exercise supplemental jurisdiction over the state law claim for medical malpractice. *Id.*

The plaintiff suffered from peripheral diabetic neuropathy, "a disease which causes numbness in the feet and which makes any injury to his feet a serious health risk." *Id.* at 644. The plaintiff sustained burns to his feet during a Native American sweat lodge ceremony on February 22, 2001. *Id.* Medical personnel wrote an order requiring a daily medical shower followed by a change of dressings, the application of burn ointment, and a temporary restriction from participation in sweat lodge ceremonies. *Id.* The plaintiff became frustrated with medical personnel and decided to assume responsibility for his own care. *Id.*

On March 22, 2001, medical personnel noted that the wounds on the plaintiff's feet were not closing, and recommended that he undergo skin grafting. *Id.* at 644. A skin graft was scheduled for April 10, 2001, but on April 9, medical personnel noticed signs of an infection on the plaintiff's right foot. *Id.* at 645. On April 10, the plaintiff complained of a fever and pain, and was taken to the hospital where doctors determined that the infection made it necessary to amputate portions of the plaintiff's right foot. *Id.* They per-

formed the amputations on April 11 and 21, approximately two months after the plaintiff sustained the burns. *Id.*

On appeal, the plaintiff argued that expert testimony on causation was not necessary "because an infection is within the realm of common knowledge." *Id.* at 646. The court of appeals, however, noted that the plaintiff was predisposed to this kind of injury, that his condition worsened after he refused treatment, and that the amputations only became necessary two months after he sustained the burns. *Id.* The court of appeals held that "[p]roof of causation by expert testimony is required when a plaintiff is complaining about treatment of a sophisticated injury," and "[g]iven all the different factors that could have resulted in [the plaintiff's] amputations ... medical evidence was needed. Otherwise a reasonable juror could not determine whether delays in treatment or other factors caused the need for the amputations." *Id.*

▄▄▄ In this case, the causal link between any alleged negligence and Mr. Barbee's death 17 months later is not within the realm of "common knowledge." The long-term effects of internal bleeding are not so widely known as to be analogous to leaving a sponge within a patient or removing the wrong limb during an amputation. *Craft*, 78 Hawai'i at 298, 893 P.2d at 149. Moreover, Mr. Barbee had a history of preexisting conditions including hypertension, diabetes, and cancer, and also suffered numerous and serious post-operative medical conditions including, inter alia, a stroke and surgery to remove part of his intestine which had become gangrenous. The role that preexisting conditions and/or the subsequent complications of this type played in Mr. Barbee's death is not within the knowledge of the average layperson.

Mr. Barbee therefore sustained a "sophisticated injury," and a reasonable jury would need expert medical testimony to determine whether and to what extent any alleged negligence by Defendants contributed to his eventual demise more than 17 months after the surgeries of July 24, 2001. *Gibson*, 433 F.3d at 646. Thus, Plaintiffs were required to present expert testimony on the causal

link between any alleged negligence and Mr. Barbee's death.

## 2. Rustam Barbee Did Not Provide Expert Testimony

Plaintiffs next argue that "[e]ven if the cause of death is not obvious, in this case it was testified to by expert testimony" because "Rustam Barbee is an expert witness." First, Plaintiffs argue that Rustam "gleaned specialized knowledge regarding laparoscopic surgery and multiple organ failure due to severe loss of blood over a course of 18 months." Second, Plaintiffs argue that "based on the trial court's actions, Plaintiffs reasonably believed that Rustam Barbee's testimony would be sufficient to meet the legal standard." Plaintiffs observe that "the trial court refused to qualify any witness as expert witnesses and chose instead to either exclude or include a witness's testimony as to a particular issue[,]" and further note that Defendants did not object to Rustam's testimony regarding causation and did not request that it be stricken.

■ Plaintiffs' arguments are without merit. First, Plaintiffs suggest several ways in which Rustam acquired specialized knowledge that qualified him to offer expert testimony. Plaintiffs argue that Rustam attended consultations with Dr. Yarbrough prior to the surgery, "was present at the hospital on the day of the surgery and spoke to several doctors regarding the first and second surgeries and its complications[,]" visited Mr. Barbee every day he was in the hospital and "continued to speak with doctors concerning his father's care and condition[,]" "personally cared for his father and participated in keeping daily journals [regarding that care,]" and "[n]ear the end of [Mr. Barbee's] life, Rustam [ ] attended meetings with doctors to discuss [Mr. Barbee's] health." However, Rustam's experiences in addressing his father's prolonged illness and death did not render him an expert qualified to opine on Mr. Barbee's cause of death. Although Plaintiffs cite *State v. Maelega*, 80 Hawai'i 172, 907 P.2d 758 (1995), in support of their position that Rustam's "specialized knowledge" provided a sufficient basis for his "expert testimony," that case is distinguishable from the facts at issue here. In *Maelega*,

the supreme court held that the trial court did not abuse its discretion in qualifying a witness as an expert in domestic relations. *Id.* at 182, 907 P.2d at 768. The witness provided the jury with "relevant specialized knowledge" since she had "been involved with domestic violence projects since the 1960s[,] . . . administered violence control programs for perpetrators and victims of domestic violence in Hawai'i, involving more than 500 men and over 750 women[,] . . . [and kept] current in the field of domestic violence by attending national meetings, reading relevant publications, obtaining professional training, and working with recognized leaders in the field." *Id.* at 182–83, 907 P.2d at 768–69.

The level of specialized knowledge that Rustam developed through dealing with his father's illness clearly does not rise to the level of experience and knowledge which the witness in *Maelega* had developed while working with hundreds of domestic violence perpetrators and victims. Moreover, the subject matter at issue here—determining whether the Defendants' alleged negligence caused Mr. Barbee's death 17 months later, in light of Mr. Barbee's preexisting conditions and post-surgical complications—is one that requires specialized training and education to address, *see, e.g., Jones v. Lincoln Elec. Co.*, 188 F.3d 709, 723–24 (7th Cir.1999) (witness who had a mechanical engineering degree but who lacked medical degree or training was not qualified to offer opinion about the effect of manganese fumes on the human body), and thus is distinguishable from the non-technical subject matter upon which the witness testified in *Maelega*, 80 Hawai'i at 182, 907 P.2d at 768 ("a trial court may disallow expert testimony if it concludes that the proffer of *specialized knowledge* is based on a mode of analysis that lacks trustworthiness").

■ Nor do we agree with the suggestion that the circuit court's approach to the admission of expert witness testimony led Plaintiffs to believe that Rustam had provided expert testimony with regard to causation. As we noted in section V.A.2 supra, although there is no explanation in the record for the circuit court's approach, it appears that it

was the circuit court's practice to not make findings before the jury as to the qualifications of any expert witnesses. However, Plaintiffs do not suggest what they would have done differently had the court taken a different approach. Moreover, the mere fact that the testimony was admitted without objection does not convert Rustam into a medical expert whose testimony satisfied the requirement that, in a medical malpractice case, a plaintiff must establish causation through the introduction of expert medical testimony. *See, e.g., Devine,* 59 Haw. at 52, 574 P.2d at 1353. Put another way, the record does not contain "credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support [the] conclusion" that Rustam was a medical expert within the meaning of *Devine* and related cases. *See, e.g., Nelson v. University of Hawai'i,* 97 Hawai'i 376, 393, 38 P.3d 95, 112 (2001) (citation and brackets in original omitted).

### 3. Plaintiffs Did Not Present Sufficient Expert Medical Testimony on Cause of Death at Trial

█ Plaintiffs next argue that "there is a significant amount of expert testimony both by Plaintiff and Defendant doctors, which support Rustam Barbee's conclusions as to Lloyd Barbee's death." Plaintiffs point out, inter alia, that Dr. Bretan testified that "the damage that was caused by the kidneys, the damage that was caused to the brain of this patient were ongoing and progressive"; that Dr. Clayman testified that a hemoglobin of three indicates " 'severe anemia, likely incompatible with life' "; and that Dr. Yarbrough testified that "[i]f [Mr. Barbee] had not had surgery [on July 21, 2001], ... the next day he would not have been in ICU[.]" [15] However, the expert testimony at trial fell short of establishing that any alleged negligence of the Defendants caused Mr. Barbee's death.

█ In a medical malpractice action, expert testimony on causation must be based on a "reasonable medical probability." *Craft,* 78 Hawai'i at 305, 893 P.2d at 156 (citing *McBride v. United States,* 462 F.2d 72, 75 (9th Cir.1972) (stating that a plaintiff must show with reasonable medical probability that a causal nexus existed between the physician's treatment or lack thereof, and the plaintiff's injury in a medical malpractice action)); *Duff v. Yelin,* 721 S.W.2d 365, 369–370 (Tex.App.1986), *aff'd,* 751 S.W.2d 175 (Tex. 1988) (the opinion testimony of an expert providing the causal nexus must be grounded upon reasonable medical probability as opposed to a mere possibility because possibilities are endless in the field of medicine). "On the other hand, when an expert merely testifies that a defendant's action or inaction *might* or *could have* yielded a certain result, such testimony is 'devoid of evidentiary value' and fails to establish causation." *Wicklund v. Handoyo,* 181 S.W.3d 143, 149 (Mo. Ct.App.2005) (citation omitted).

Here, the evidence fell short of providing the causal nexus between any alleged negligence of Defendants and Mr. Barbee's death. There was no expert medical testimony that negligence by Defendants caused Mr. Barbee's death "to a reasonable medical probability." The evidence at trial, including testimony that damage to Mr. Barbee's kidneys and brain was "ongoing and progressive," that a hemoglobin level of three is "likely incompatible with life," and that "[i]f [Mr. Barbee] had not had surgery [on July 21, 2001], ... the next day he would not have been in ICU," at most established that it was possible that the actions of Defendants caused Mr. Barbee's death-a showing which the Hawai'i supreme court explicitly found to be insufficient in *Craft,* 78 Hawai'i at 305, 893 P.2d at 156. In effect, the jury was left to speculate that Defendants' "action or inaction *might* or *could have* " resulted in Mr. Barbee's death 17 months later. *Wicklund,* 181 S.W.3d at 149. Therefore, "such testimony

---

**15.** Plaintiffs also cite to several statements made by Dr. Keane and Dr. Yu. However, as discussed in section V.B.1., supra, we have affirmed the circuit court's ruling preventing Dr. Keane from giving expert testimony, and Dr. Yu was called by Plaintiffs as a lay witness. In any event, even

if their testimony is considered as expert testimony, it was insufficient to establish the cause of Mr. Barbee's death even if considered in conjunction with the testimony of Drs. Bretan, Clayman, and Yarbrough.

... fails to establish causation." *Id.; see Mueller v. Bauer*, 54 S.W.3d 652, 657 (Mo.Ct. App.2001) (defendant made a prima facie case that plaintiffs could not establish the element of causation where plaintiffs' only identified expert testified that he was unable to determine the cause of patient's death with reasonable probability and that it was a matter of speculation whether patient's death was caused by the antiarrhythmic drug, allegedly negligently prescribed, or by a preexisting condition).

#### 4. The "Loss of Chance" Doctrine Does Not Relieve the Plaintiffs of Their Burden of Providing Expert Medical Testimony Establishing Causation

 Plaintiffs lastly argue that they "proved by a preponderance of the evidence medical causation under the 'loss of chance' doctrine." Citing *McBride v. United States*, 462 F.2d 72 (9th Cir.1972), they argue that "evidence revealing an improved chance of survival by providing a particular treatment may create a jury question as to the causal connection between the failure to provide that treatment and the subsequent death of a patient."

The plaintiffs' decedent in *McBride* suffered a fatal heart attack after visiting a hospital earlier in the evening, and being allowed to leave the hospital despite having complained of chest pains. *Id.* at 73. The district court granted a dismissal for the defendants on causation, but the ninth circuit reversed. *Id.* The ninth circuit noted:

> When a plaintiff's cause of action rests upon an allegedly negligent failure to give necessary treatment, he must show, with reasonable medical probability, that the treatment would have successfully prevented the patient's injury. . . . Yet the absence of positive certainty should not bar recovery if negligent failure to provide treatment deprives a patient of a significant improvement in his chances for recovery.

*Id.* at 75.

The Hawai'i Supreme Court cited *McBride* in *Craft v. Peebles* for the proposition that "[i]n a medical malpractice action, a plaintiff must show with reasonable medical probability a causal nexus between the physician's treatment or lack thereof and the plaintiff's

injury." 78 Hawai'i at 305, 893 P.2d at 156. Thus, the fundamental requirement of establishing causation by expert medical testimony remains. Since Plaintiffs failed to provide that testimony, the circuit court did not err in granting the renewed motions for judgment as a matter of law.

### VI. CONCLUSION

Accordingly, we affirm the July 19, 2006 Judgment entered in the Circuit Court of the First Circuit.

