**NOT FOR PUBLICATION IN WEST'S HAWAI'I REPORTS AND PACIFIC REPORTER**

**Electronically Filed
Intermediate Court of Appeals
CAAP-17-0000663
26-JUN-2023
08:52 AM
Dkt. 139 MO**

NO. CAAP-17-0000663


IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I


ROBERT J. DAHLAGER,
as Personal Representative of the
ESTATE OF ROBERT G. DAHLAGER, Deceased, and MARY DAHLAGER,
Plaintiffs-Appellants/Cross-Appellees, v.
JACK'S DIVING LOCKER, Defendant-Appellee/Cross-Appellant, and
JOHN DOES 1-10; JANE DOES 1-10; DOE PARTNERSHIPS 1-10;
DOE CORPORATIONS 1-10; ROE "NON-PROFIT" CORPORATIONS 1-10;
and ROE GOVERNMENTAL ENTITIES 1-10,
Defendants-Appellees/Cross-Appellees.


APPEAL FROM THE CIRCUIT COURT OF THE THIRD CIRCUIT
(CASE NO. 3CC14-1-00262K)


MEMORANDUM OPINION
(By: Ginoza, Chief Judge, Wadsworth and McCullen, JJ.

Plaintiffs-Appellants/Cross-Appellees Robert G.

Dahlager (**Robert**)[1] and Mary Dahlager (**Mary**) (collectively

**Dahlagers**) appeal from the Circuit Court of the Third Circuit's

(1) August 16, 2017 Final Judgment and (2) June 2, 2017

---

[1] Robert passed away on August 9, 2017. His son Robert J. Dahlager (**Rob**) was appointed as personal representative for Robert's estate, and in that capacity was substituted into this case for Robert.

"Findings of Fact [(**FOF**)] and Conclusions of Law [(**COL**)] and Order After Jury-Waived Trial."[2]

Defendant-Appellee/Cross-Appellant Jack's Diving Locker (**Jack's**) appeals from the circuit court's (1) February 17, 2017 "Order Granting Plaintiffs' Motion to Compel Production of Documents Filed December 27, 2016[,]" (2) March 1, 2017 "Order Granting Plaintiffs' Motion to Compel Discovery and for Discovery Sanctions Filed January 13, 2017[,]" (3) March 23, 2017 "Order Granting Fees and Costs Related to Plaintiffs' Motion to Compel Production of Documents Filed December 27, 2016[,]" and (4) March 23, 2017 "Order Granting Fees and Costs Related to Plaintiffs' Motion to Compel Discovery and for Discovery Sanctions Filed January 13, 2017[.]"

We affirm.

## I.    BACKGROUND

### A.    Factual Background

According to the Dahlagers, Robert went to Jack's on July 25, 2012, with his son Rob and grandson (**Grandson**), who were visiting from Colorado.  Rob and Grandson were going on an open-water dive tour with an instructor from Jack's, however Grandson needed to complete a pool certification prior to the tour.  While Robert and Rob waited for Grandson to complete his

---

[2]    The Honorable Melvin H. Fujino presided.

2

certification, Robert sat on a plastic chair on Jack's pool deck and Rob sat beside him.

After sitting on the chair for about an hour, Robert turned to speak to Rob and Robert's chair collapsed backwards.[3] FOF 5, 7. Robert fell on his back and hit his head, and immediately shouted that his back hurt. FOF 8. Robert was unable to straighten his back or "get up off the ground[.]" FOF 9, 10.

An ambulance transported Robert to Kona Community Hospital. FOF 11. X-rays of his spine taken that same day showed old injuries "but no new injury." FOF 13.

Two months later, Robert had an MRI and was diagnosed with a "T10 Chance Fracture." FOF 17. Robert believed his fall at Jack's caused this fracture. FOF 18.

After his fall at Jack's, Robert suffered other injuries. On October 31, 2013, Robert was on his lanai when he tripped, fell, and broke his right shoulder. FOF 21. At trial, Robert testified he did "not have range of motion, [could not] raise his arm above his eyes, and [could] barely get his arm above his arm pits." FOF 22. He also testified that on one occasion when "he was using an inversion table for physical

_____

[3] The parties do not expressly challenge any findings of fact in their points of error.

therapy related to the fall at Jack's," he sustained a neck injury.  FOF 23.

Before his fall at Jack's, Robert operated a bed and breakfast, but said he was forced to sell it and move to Arizona because the business suffered losses due to his injuries.  FOF 24.

**B.    Procedural Background**

**1.    Dahlagers' Complaint**

On July 22, 2014, three days before the statute of limitations would have expired, the Dahlagers filed their complaint, claiming the chair collapsed on Jack's pool deck as a result of Jack's "negligent and careless disregard of duty[.]" The Dahlagers asserted that Jack's failed to "properly inspect and maintain the chairs provided to guests; . . . properly warn users" of the chairs' "defective and/or dangerous condition; and . . . exercise ordinary care for the safety of users of [its] premises open to the public."  The Dahlagers further asserted that Robert suffered "serious and permanent injuries" as a result of the chair collapse and subsequent fall at Jack's.

The Dahlagers, however, did not serve the complaint on Jack's until January 9, 2015, almost six months later.

2. **Interrogatories, Production of Documents, and Expert Reports**

On October 8, 2015, Jack's responded to the Dahlagers' first request for production of documents, identifying the PADI[4] incident report form (**PADI Incident Report**) and Earl Watanabe's investigative report (**Watanabe Report**).[5]  Jack's, however, stated that it was withholding production of these reports because they were "both prepared in anticipation of litigation and to obtain insurance defense."

A week later, Jack's responded to the Dahlagers' first request for answers to interrogatories.  In its response, Jack's explained that of the ten chairs it purchased from Walmart, it returned nine of the chairs after the incident but "held" the chair Robert sat on for more than two years before disposing of it as it received no notice of a suit:

> On June 8, 2012, Defendant purchased from Walmart 10 of the same type of chairs that Plaintiff was seated in at the time of the claimed fall.  After the incident with Plaintiff, the particular chair that Plaintiff was seated in was placed in storage and held for more than 2 years, in anticipation of possible litigation, and when Defendant received no notice of claim, more than 2 years after the incident, the chair was disposed of.  The other 9 chairs were returned to Walmart on July 26, 2012 as a precaution.

---

[4]  PADI is the Professional Association of Diving Instructors.  PADI provides scuba certifications to individuals and dive centers.  Jack's "PADI Dive Center/Resort Certificate" states "[t]he insurance afforded by this policy is a master policy issued to PADI Worldwide Corporation."

[5]  PADI's insurer, Lexington Insurance Company retained York Insurance Services Group as its third-party adjustor.  York Insurance Services Group in turn retained ICS Merrill, EMSI Investigative Services Division, to investigate Robert's claims.  ICS Merrill assigned Watanabe as the investigator.

On February 22, 2016, the circuit court continued the bench trial from July 19, 2016, to March 8, 2017. The circuit court further ordered the Dahlagers to provide their written expert reports by November 10, 2016, but the Dahlagers did not provide any expert reports.

### 3.   Motions to Compel and Sanctions

On December 27, 2016, over a year after Jack's disclosed the existence and withholding of the Watanabe and PADI reports, the Dahlagers moved to compel production of these reports.

Attached to its memorandum opposing the production of these reports, Jack's provided a declaration from Teresa Leicher (**Leicher**), co-owner and managing partner of Jack's, dated January 2017. Leicher explained that Jack's purchased ten chairs from Walmart on June 8, 2012. Leicher further explained that an August 28, 2012 letter notified Jack's that Ian Mattoch was representing the Dahlagers, but "when more than two years passed, and Jack's [] was not served with a Complaint from Mr. Dahlager, we disposed of the chair that Mr. Dahlager was seated in at the time of his fall."

The circuit court granted the motion, finding the Watanabe Report and the PADI Incident Report were "not within the attorney-client privilege under Sapp v. Wong as well as -- as the case being cited in the rules of discovery." (Formatting

altered.) 62 Haw. 34, 609 P.2d 137 (1980). Jack's complied, providing both reports.

The PADI Incident Report was a four-page report detailing the incident. It was completed on the day of the incident by Andrew Woerner (**Woerner**), Jack's operations manager at the time, and was faxed to PADI, where a claim file was opened. Jack's submitted the PADI Incident Report "with the expectation that the contents would be kept confidential" and the first page of the PADI incident Report states "[t]his report is prepared in anticipation of litigation[.]" (Formatting altered.) "PADI [I]nsureds" such as Jack's "are requested to prepare an incident report whenever an event occurs which may result in litigation."

As for the Watanabe Report, Watanabe was assigned in September 2012 to investigate Robert's claims against Jack's. The Watanabe Report was dated October 9, 2012, and stated "[t]his confidential report is submitted in anticipation of future litigation. It is and should always be considered attorney/client work product[.]" (Formatting altered.) The Watanabe Report included details about the investigation, and provided full summaries of interviews with witnesses, examination of the pool deck, and inspection of similar chairs sold by Walmart. In the portion of the Watanabe Report detailing Woerner's interview, the report notes "[t]he chair

7

[from the incident] was returned to [Walmart] with the others purchased at the same time as it was felt they may have been too small.  None of the chairs had been retained."

In the meantime, before Jack's produced the reports, the Dahlagers filed another motion to compel, and requested sanctions.  The Dahlagers sought information on the Watanabe Report and the PADI Incident Report, and the chairs, including the chair that collapsed.  The Dahlagers asked the circuit court to "issue an order compelling Defendant Jack's to produce the subject chair, other 9 exemplar chairs, and related investigative reports[.]"

The Dahlagers also asked the court to "issue appropriate sanctions pursuant to [Hawaiʻi Rules of Civil Procedure (**HRCP**) Rule] 37(b),"[6] assuming Jack's had indeed

---

[6]  HRCP 37(b)(2) provides in relevant part:

> If a party or an officer, director, or managing agent of a party or a person designated under Rule 30(b)(6) or 31(a) to testify on behalf of a party fails to obey an order to provide or permit discovery, including an order made under subdivision (a) of this rule or Rule 35, or if a party fails to obey an order entered under Rule 26(f), the court in which the action is pending may make such orders in regard to the failure as are just, and among others the following:
>
>> (A) An order that the matters regarding which the order was made or any other designated facts shall be taken to be established for the purposes of the action in accordance with the claim of the party obtaining the order;

(continued . . .)

"destroyed this highly relevant evidence."  The Dahlagers argued for a default judgment against Jack's as a punitive sanction because Jack's willfully destroyed the subject chair and intentionally returned the others like it.

Jack's opposed the Dahlagers' motion, and included another declaration by Leicher, also dated January 2017.  In this declaration, Leicher stated Ian Mattoch "notified our insurer that he no longer represented the Dahlagers on or about January 14, 2013."

The Dahlagers replied, and included copies of the Watanabe and PADI reports Jack's produced along with two receipts from Walmart - one dated June 8, 2012 showing a purchase in the amount of $89.80 pretax for ten chairs along with other items, and one dated July 26, 2012 showing credit issued in the amount of $93.54 for "General MDSE Total[.]" (Formatting altered.)

_____

(. . . continued)

> (B) An order refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting him or her from introducing designated matters in evidence;
>
> (C) An order striking out pleadings or parts thereof, or staying further proceedings until the order is obeyed, or dismissing the action or proceeding or any part thereof, or rendering a judgment by default against the disobedient party . . . .

(Formatting altered.)

At the hearing on the Dahlagers' motion to compel discovery and for sanctions, the circuit court noted there was an inconsistency regarding Jack's failure to preserve the chair. Jack's position had been that "the chairs were destroyed two years after the incident[,]" but the circuit court noted that "based on the [c]ourt's ruling to compel discovery it appears they may have been [re]turned . . . to [Walmart] the second day after the incident[.]"

The court also noted Jack's was under a duty to preserve the evidence and analyzed whether sanctions were appropriate. In determining sanctions were indeed appropriate, the circuit court stated that Jack's "will be precluded from opposing or claiming that nothing was wrong with the chair, because the [Dahlagers] have not had an opportunity to inspect the chair" and it "will allow reasonable attorney's fees and costs." For the two motions to compel, the circuit court awarded the Dahlagers a total of $20,037.55 in fees and costs.

4. **Motion to Exclude Expert Testimony on Causation**

In a motion in limine, Jack's moved to limit testimony from treating physicians because the Dahlagers "chose not to submit any expert report regarding what injuries they believe were caused by the fall at Jack's Diving Locker on July 25, 2012." Jack's also explained that it requested copies of medical records related to the treatment of injuries Robert

claims were sustained at Jack's, but the Dahlagers instead "identified particular medical establishments[.]"

Jack's argued that given the nondisclosure of expert reports, treating physicians should be precluded from testifying as to causation. The circuit court granted Jack's motion, ruling that "[a]ny experts called by [the Dahlagers], and there are no expert reports, will be excluded from testifying as to causation."

### 5. Bench Trial

The circuit court held a bench trial over the course of three days with six witnesses testifying - Robert, Rob, Grandson, Mary, Leicher, and Woerner.

The circuit court entered its "Findings of Fact and Conclusions of Law and Order after Jury-Waived Trial[,]" concluding that "Jack's did not breach its duty of care to Plaintiff [Robert] Dahlager" and the Dahlagers "failed to prove by a preponderance of the evidence that any injury alleged was legally or proximately caused by a defective chair on July 25, 2012." COL 3 and 12. The circuit court then entered its final judgment in favor of Jack's and against the Dahlagers "as to all claims in Plaintiffs' Complaint with prejudice[.]"

Both parties timely appealed.

## II. DISCUSSION

On appeal, the Dahlagers challenge the circuit court's decisions regarding breach of duty and causation, sufficiency of discovery sanctions, and exclusion of causation testimony by treating experts. In its cross-appeal, Jack's challenges the circuit court's order to produce documents, finding of spoliation, and award of attorney's fees and costs. We affirm.

## A. Negligence - Breach and Causation Elements

In their first point of error, the Dahlagers contend that the circuit court "erred in ruling that [Jack's] did not breach its duty of care to [Robert], and [Robert] failed to prove by a preponderance of the evidence that any alleged [sic] was legally or proximately caused by a defective chair." Specifically, the Dahlagers challenge COL 3 and 12.[7]

> The elements of a negligence cause of action are:
>
> 1. A duty, or obligation, recognized by the law, requiring the defendant to conform to a certain standard of conduct, for the protection of others against unreasonable risks;
>
> 2. A failure on the defendant's part to conform to the standard required: a breach of duty[;]
>
> 3. A reasonably close causal connection between the conduct and the resulting injury[;] and

---

[7] These COL state as follows:

> **COL 3** "Defendant Jack's did not breach its duty of care to Plaintiff [Robert] Dahlager."
>
> **COL 12** "This Court concludes that Plaintiffs failed to prove by a preponderance of the evidence that any injury alleged was legally or proximately caused by a defective chair on July 25, 2012."

> 4. Actual loss or damage resulting to the interests of another[.]

Knodle v. Waikiki Gateway Hotel, Inc., 69 Haw. 376, 384-85, 742 P.2d 377, 383 (1987) (cleaned up).

"Whether there was a breach of duty or not, i.e., whether there was a failure on the defendant's part to exercise reasonable care, is a question for the trier of fact." Doe Parents No. 1 v. State of Hawaiʻi, Dep't of Educ., 100 Hawaiʻi 34, 57-58, 58 P.3d 545, 568-69 (2002) (emphasis omitted). "[A]bsent uncontroverted evidence from which only one inference can reasonably be drawn, the questions of breach of duty and legal causation constitute questions of fact, reviewable on appeal only for clear error." 100 Hawaiʻi at 58, 58 P.3d at 569.

### 1.   Breach of Duty Element

Challenging COL 3, the Dahlagers argue that Jack's "negligently breached its duty of care by ignoring the manufacturer's restrictions of use, and by failing to warn its customers of the cheap, flimsy chair's limitations." "The additional fact that [it] *removed* the warnings for its patrons and guests only compounded [its] breach of duty to warn."

At trial, the Dahlagers introduced evidence that a chair substantially similar to the chair Robert used warned against use on uneven, wet, or slippery surfaces; listed a

maximum weight capacity of 250 pounds; and was intended for residential use only.

However, the circuit court's findings support COL 3. The circuit court found Robert weighed approximately 220-230 pounds at the time of the incident, which was below the chair's 250-pound weight limit. FOF 33. The circuit court also found that the Dahlagers did not offer evidence to establish that the commercial use of the chair created an unsafe condition. FOF 39. Moreover, there was conflicting evidence whether the area Robert was sitting in was wet at the time of the incident, and the Dahlagers offered no evidence that pooling of water "caused the chair to buckle and collapse." FOF 52, 61. Finally, the circuit court found that Robert was sitting in the chair for about an hour before the fall. FOF 5.

The Dahlagers did not challenge these findings in their points of error and, thus, these findings are binding on this court. See Okada Trucking Co. v. Bd. of Water Supply, 97 Hawaiʻi 450, 459, 40 P.3d 73, 82 (2002) (noting unchallenged findings of fact are binding on the appellate courts). Based on these unchallenged findings, the Dahlagers failed to establish that Jack's use of the chair posed an unreasonable risk of harm as related to the manufacturer's warnings.

The Dahlagers also argue that, "[a]s part of their [sic] mode of operations and marketing strategy, [Jack's]

14

invited relatives and friends of customers taking scuba lessons to sit in plastic chairs on the wet pool deck and observe the lessons."

The Hawaiʻi Supreme Court adopted the mode of operation rule in Gump:

> where a plaintiff is able to demonstrate that the business proprietor adopted a marketing method or mode of operation in which a dangerous condition is reasonably foreseeable and the proprietor fails to take reasonable action to discover and remove the dangerous condition, the injured party may recover without showing actual notice or constructive knowledge of the specific instrumentality of the accident.

Gump v. Wal-Mart Stores, Inc., 93 Hawaiʻi 417, 420, 5 P.3d 407, 410 (2000).

We note that the supreme court limited the mode of operation rule to circumstances such as that case.  See Gump, 93 Hawaiʻi at 421, 5 P.3d at 411 (explaining that "the rule is limited to circumstances such as those of this case.  Wal-Mart chooses, as a marketing strategy, to lease store space to McDonald's in order to attract more customers and encourage them to remain in the store longer.  Wal-Mart also chooses, for the most part, not to prevent patrons from carrying their McDonald's food into the Wal-Mart shopping area.  This mode of operation gave rise to the hazard that caused Gump's injury").  This situation is unlike that in Gump.

We further note that the dangerous condition the Dahlagers asserted at trial was the defective condition of the

15

chair, that is, the narrow gap between the chair's back legs and its material that could become brittle if exposed to the sun. But, the Dahlagers presented no evidence that the claimed dangerousness of the chair was reasonably foreseeable and that Jack's failed to take reasonable action to discover the dangerousness and remove the chair. See generally, Fredrickson v. Bertolino's Tacoma, Inc., 127 P.3d 5, 9-10 (Wash. Ct. App. 2005) (declining to extend Washington's mode of operation exception to a collapsed chair incident where plaintiff did not establish, "that the danger of breaking chairs was continuous or foreseeably inherent in the nature of" defendant's business).

In sum, the circuit court's conclusion that Jack's did not breach its duty of care to Robert was not erroneous.

## 2. Causation Element

Challenging COL 12, the Dahlagers argue that the circuit court erred in ruling that they "failed to prove by a preponderance of the evidence that any alleged [sic] was legally or proximately caused by a defective chair."

However, COL 12 was supported by the circuit court's unchallenged findings. The circuit court found that the Dahlagers "did not introduce evidence of a causal link between the alleged defective condition of the Subject Chair and Mr. Dahlager's fall" and that x-rays taken the day of the

incident showed Robert's old back injuries "but no new injuries."  FOF 27(a), 47.

The Dahlagers further contend the doctrine of res ipsa loquitur is applicable to the instant case.

"*Res ipsa loquitur* permits an inference of negligence when the thing that produced a person's injury is under the control and management of the defendant, and the injury could not have occurred in the ordinary course of events but for the defendant's failure to exercise due care."  Winfrey v. GGP Ala Moana LLC, 130 Hawaiʻi 262, 272, 308 P.3d 891, 901 (2013) (citation omitted).  However, the doctrine is not applicable "[w]here an accident could have occurred in the normal course without negligence, or where two equally plausible inferences can be drawn as to whether the accident was caused by negligence[.]"  Id. at 272-73, 308 P.3d at 901-02 (citation omitted).

Here, the Dahlagers failed to meet their burden of showing that Robert's fall could not have occurred but for Jack's failure to exercise due care.  See id. at 273, 308 P.3d at 902.  In its findings, the circuit court recounted Robert's extensive medical history that included falls and difficulties with balance, and that Robert was sitting in the chair for approximately an hour before the incident.  FOF 5, 26-27.  In

light of these unchallenged findings, the Dahlagers did not prove the elements of res ipsa loquitur.

In sum, the circuit court did not clearly err in determining that the Dahlagers failed to prove that Jack's breached its duty of care and that breach was the cause of Robert's injuries.

**B.    Discovery Rulings**

Both the Dahlagers' second point of error and Jack's cross-appeal stem from the circuit court's orders granting the Dahlagers' request for discovery sanctions against Jack's for failing to preserve the chair and withholding the Watanabe and PADI reports.

**1.    The Dahlagers' Arguments**

**a.    Default Judgment**

Specifically, the Dahlagers challenge the circuit court's refusal to enter a "default judgment on liability" for spoliation of the subject chair and the late disclosure of the Watanabe and PADI reports.

"[T]he circuit court has wide-ranging authority to impose sanctions for the spoliation of evidence." Stender v. Vincent, 92 Hawaiʻi 355, 362, 992 P.2d 50, 57 (2000). HRCP Rule 37(b)(2) "allows the court to 'make such orders . . . as are just,' including the dismissal of claims, in response to discovery violations." Id. (citation omitted). "In addition to

this rule, the circuit court also 'has the inherent power . . . to fashion a remedy to cure prejudice suffered by one party as a result of another party's loss or destruction of evidence.'" Id. (cleaned up).

Still, dismissals and default judgments under HRCP Rule 37 are drastic sanctions only authorized in extreme circumstances. See W.H. Shipman, Ltd. v. Hawaiian Holiday Macadamia Nut Co., 8 Haw. App. 354, 361, 802 P.2d 1203, 1207 (1990). Extreme sanctions, including default judgment, should be supported by "evidence of willful or contemptuous or otherwise opprobrious behavior[.]" See Weinberg v. Dickson-Weinberg, 123 Hawaiʻi 68, 76-77, 229 P.3d 1133, 1141-42 (2010).

Based on the record in this case, the circuit court did not abuse its discretion in its sanction order, including its refusal to enter default against Jack's. The circuit court found Jack's breached its duty to preserve the chair and sanctioned it for spoliation by precluding it from "contending that the chair involved in the accident was not defective or damaged prior to, and at the time [Robert] sat in it."

Moreover, although conflicting evidence pertaining to the handling of the chair arose from the Watanabe Report and Jack's took the position that the Watanabe Report was work product, Jack's disclosed the existence of the Watanabe Report and PADI Incident Report over a year before the Dahlagers filed

19

a motion to compel production of the reports. And we note the Dahlagers' motion to compel production of the reports was filed less than three months before trial. Further, Jack's turned over the reports after the matter was litigated and the circuit court ruled in the Dahlagers' favor. Finally, the Dahlagers did not point to any evidence in the record of "willful or contemptuous or otherwise opprobrious behavior" by Jack's. See Weinberg, 123 Hawaiʻi at 77, 229 P.3d at 1142.

Thus, the circuit court's sanction against Jack's was within the court's wide-ranging authority to impose sanctions.

### b. Adverse Inference

The circuit court also did not abuse its discretion in refusing to enter an adverse inference of negligence against Jack's for discovery violations. HRCP Rule 37(b)(2)(B) allows the court to sanction a party who fails to obey an order to provide or permit discovery by issuing "[a]n order refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting him or her from introducing designated matters in evidence[.]"

Here, the circuit court sanctioned Jack's for spoliation of the subject chair by precluding it from opposing the Dahlagers' claim that the subject chair was damaged or defective at the time of the incident. This sanction was

20

warranted because the circuit court found Jack's breached its duty to preserve the subject chair.

Given the overall record in this case, we cannot say that the court abused its discretion by refusing to enter an adverse inference of negligence against Jack's.

### c.    Findings of No Expert Testimony

The Dahlagers argue that the circuit court's "emphasis on the presentation of expert testimony to prove negligence was itself error" and point to FOF 34, 37, 39, 42, and 57.[8]  The Dahlagers rely on the Hawaiʻi Rules of Evidence (**HRE**) Rule 702.

HRE Rule 702 provides:

> If scientific, technical, or other specialized knowledge
> will assist the trier of fact to understand the evidence or
> to determine a fact in issue, a witness qualified as an
> expert by knowledge, skill, experience, training, or

---

[8]  These FOF state as follows:

**FOF 34**  "Plaintiffs did not offer expert testimony to establish that the Subject Chair was unsafe for Mr. Dahlager because of the 250-lb weight limit."

**FOF 37**  "Plaintiffs did not offer expert testimony to establish that the Subject Chair was unsafe for Mr. Dahlager because of the narrowness of the gap between the chair's legs."

**FOF 39**  "Plaintiffs did not offer expert or lay testimony, or any other evidence to establish that Jack's commercial use of the Subject Chair created an unsafe condition or caused Mr. Dahlager's fall."

**FOF 42**  "Plaintiffs did not offer expert testimony at trial to establish that the Subject Chair was or could have been unsafe at the time of Mr. Dahlager's fall as a result of having been left out in the sun and heat."

**FOF 57**  "Plaintiffs did not offer expert testimony regarding the safety issues involved with the Subject Chair under circumstances where the pool deck at Jack's could be wet."

education may testify thereto in the form of an opinion or otherwise. In determining the issue of assistance to the trier of fact, the court may consider the trustworthiness and validity of the scientific technique or mode of analysis employed by the proffered expert.

HRE Rule 702. "[T]he touchstones of admissibility for expert testimony under HRE Rule 702 are relevance and reliability." State v. Vliet, 95 Hawai'i 94, 106, 19 P.3d 42, 54 (2001). "[W]here the issues are within the common knowledge of the [fact finder], expert testimony is unnecessary." Brown v. Clark Equip. Co., 62 Haw. 530, 537, 618 P.2d 267, 272 (1980). But, "[e]xpert testimony may be needed in actions involving injury from a dangerous condition on a commercial property, such as that involving a deck, porch, patio or similar structure." 194 Am. Jur. Proof of Facts 3d § 275 (2022).

Expert testimony may have been helpful in assisting the court to determine if the chair was not safe for Robert. Expert testimony on the chair's weight limit (FOF 34), narrowness of the gap between the legs of the chair (FOF 37), effects of the weather on the chair (FOF 42), and use of the chair under the conditions of the pool deck (FOF 57) could have assisted the circuit court in determining the chair's safety and understanding the chair's design. Similarly, expert testimony on the commercial use of the chair (FOF 39) could have assisted the circuit court in determining whether the chair was unsafe and caused Robert's injuries.

Making findings on the lack of expert testimony was within the court's discretion and does not warrant a new trial.

## 2. Jack's Cross-appeal

As mentioned, the circuit court granted the Dahlagers' motions to compel, ordered Jack's to produce the Watanabe and PADI reports, sanctioned Jack's for destroying the chair, and ordered Jack's to pay $20,037.55 in related attorney's fees and costs. In its cross-appeal, Jack's asserts that the circuit court abused its discretion, contending the court failed to address HRCP Rule 26(b)(4) and the related work product doctrine.[9]

The appellate courts give deference to the trial court's decision to grant discovery. See Anastasi v. Fid. Nat'l Title Ins. Co., 137 Hawaiʻi 104, 111, 366 P.3d 160, 167 (2016).

### a. PADI Incident Report

Before the circuit court, Jack's asserted that the "only purpose in preparing the PADI Incident Report that has been withheld as privileged was to facilitate the rendition of legal services if Mr. Dahlager filed suit. It was prepared with the expectation that its contents would be kept confidential,

_____

[9] In Jack's memorandum in opposition to, and the January 24, 2017 hearing on, the Dahlagers' motion to compel, Jack's appears to assert that the PADI and Watanabe reports were both protected under the attorney-client privilege and as work product. Jack's, however, analyzed the PADI Incident Report as protected under attorney-client privilege, and the Watanabe Report as work product, in its memorandum in opposition. In determining whether Jack's met its burden and whether the circuit court abused its discretion, we address the issues as Jack's presented in its analysis to the circuit court.

23

and provided to counsel." Jack's argued that the PADI Incident Report fell within the attorney-client privilege.

To support its position, Jack's provided a declaration from Leicher, which stated that the PADI Report was prepared by Woerner on the same day as the incident and faxed to PADI, who would provide it to an attorney should there be a lawsuit:

> At my direction, I had Andy Woerner, an instructor for Jack's Diving Locker, complete a PADI Incident Report on July 25, 2012. The 4 page report was then faxed to PADI to be provided to our attorney in the event that a lawsuit was filed. The report was specifically prepared for counsel, and is labelled "Incident Report Form This Report Is Prepared In Anticipation Of Litigation". When Jack's Diving Locker submitted the PADI Incident Report, it was with the expectation that the contents would be kept confidential, and provided to counsel assigned to defend us. As a certified PADI facility, Jack's Diving Locker is insured through a policy obtained through PADI, which is providing the defense to Jack's Diving Locker in this case.

Jack's also provided a declaration from Michael D. Treacy (**Treacy**), which stated that PADI requests its insureds to complete an incident report whenever an event may result in litigation, and the report would be forwarded to counsel when a suit is filed:

> A claims file was opened for this matter upon submission of a PADI Incident Report from Jack's Diving Locker. PADI insureds are requested to prepare an incident report whenever an event occurs which may result in litigation. The PADI incident report is forwarded to defense counsel, once suit is filed.

The circuit court ordered that the PADI Incident Report be produced.

The rule on attorney-client privilege provides in part:

> A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client
>
> (1) between the client or the client's representative and the lawyer or the lawyer's representative, or
>
> (2) between the lawyer and the lawyer's representative, or
>
> (3) by the client or the client's representative or the lawyer or a representative of the lawyer to a lawyer or a representative of a lawyer representing another party in a pending action and concerning a matter of common interest, or
>
> (4) between representatives of the client or between the client and a representative of the client, or
>
> (5) among lawyers and their representatives representing the same client.

HRE Rule 503(b) (formatting altered).

This "privilege is bottomed on assumptions that lawyers can act effectively only if they are fully advised of the facts by the parties they represent and disclosure will be promoted if the client knows that what he tells his lawyer cannot be extorted from the lawyer." DiCenzo v. Izawa, 68 Haw. 528, 535, 723 P.2d 171, 175 (1986) (cleaned up). But since this privilege may suppress relevant evidence and forestall truth seeking, it "must be strictly limited to the purpose for which it exists." Id. (citation omitted).

The Hawaiʻi Supreme Court has explained that it has "serious doubts about the advisability of making statements taken by an insurance investigator or adjuster immune from

25

discovery as a matter of policy." DiCenzo, 68 Haw. at 537, 723 P.2d at 177 (cleaned up). "For the internal documents of insurance companies obtained in the normal course of business relating to the claims of their insureds would then be shielded from discovery, and we would be creating a new privilege (insured-insurer) or extending a statutory privilege beyond its intended reach." 68 Haw. at 537-38, 723 P.2d at 177 (cleaned up).

Here, Jack's bore the burden of showing the PADI Incident Report was protected by attorney-client privilege. See Sapp v. Wong, 62 Haw. 34, 38, 609 P.2d 137, 140 (1980) (explaining that "[p]roper practice requires preliminary judicial inquiry into the existence and validity of the privilege and the burden of establishing the privilege rests on the claimant").

The Leicher declaration made blanket statements that the PADI report was, and Jack's expected it to be, confidential. But Leicher did not provide specific facts showing the report was covered by attorney-client privilege. And although Leicher and Treacy indicated the report would make its way to an attorney should a suit be filed, Jack's sent the report to PADI and there was no evidence that PADI acted as Jack's lawyer or the lawyer's representative. HRE Rule 503(a)(4) ("A

26

'representative of the lawyer' is one directed by the lawyer to assist in the rendition of professional legal services").

To the extent Leicher's declaration implies that PADI is Jack's representative because PADI is providing a defense for Jack's, a similar situation occurred in DiCenzo.  68 Haw. at 534, 723 P.2d at 174; HRE Rule 503(a)(2) ("A 'representative of the client' is one having authority to obtain professional legal services, or to act on advice rendered pursuant thereto, on behalf of the client").

In DiCenzo, "[t]he trial court ruled . . . that the statements made by Defendant Helen M. Izawa to her insurance company are privileged under" HRE Rule 503.  DiCenzo, 68 Haw. at 534, 723 P.2d at 174 (internal quotation marks omitted). Overturning the trial court's ruling, the Hawai'i Supreme Court explained, "[w]ere we to uphold the privilege under these circumstances, any report or statement made by an insured person to an investigator or adjustor employed or retained by the insurer would be within the attorney-client privilege as a matter of law."  68 Haw. at 536-37, 723 P.2d at 176.  The supreme court declined to adopt the holdings of other courts "that the insured may properly assume the communication was made to the insurer as an agent for the dominant purpose of transmitting it to an attorney for the protection of the interest of the insured" since the insurer selects the attorney

and conducts the defense. DiCenzo, 68 Haw. at 537, 723 P.2d at 176 (cleaned up).

Based on the evidence it presented to the circuit court, Jack's did not meet its burden of showing that the PADI Incident Report fell within the attorney-client privilege. Thus, the circuit court did not abuse its discretion in granting the Dahlagers' motion to compel production of the PADI Incident Report.

**b. Watanabe Report**

Before the circuit court, Jack's asserted that "the purpose of the investigative report being requested was to assist in litigation" and that the report "was requested only *after* the Dahlager's [sic] themselves had an attorney contact Jack's . . . ." Jack's argued that the Dahlagers had "not established a substantial need for the investigative report" and "[t]he fact that [Jack's] no longer has the subject chair also should not be a basis for requiring production of the investigative report."

In support of its position, Jack's attached the Treacy declaration, which stated the sequence of events leading to the creation of the Watanabe Report:

> On September 11, 2012, Ada De La Cruz of York Insurance Services Group, engaged the services of ICS Merrill, EMSI Investigative Services Division to conduct an investigation on [Robert's] claims. Prior to the request being made, attorney Ian Mattoch had submitted a letter of representation, dated August 28, 2012. Investigator Earl Watanabe of ICS Merrill prepared a confidential

28

> investigative report, dated October 9, 2012, concerning [Robert's] claim. The investigative report of Earl Watanabe is labeled, "This Confidential Report Is Submitted In Anticipation Of Future Litigation. It Is And Should Always Be Considered Attorney/Client Work Product."

The circuit court granted the Dahlagers' motion to compel and ordered Jack's to produce the Watanabe Report.

Jack's bore the burden of showing that the Watanabe Report was work product. See Roy v. Gov't Emps. Ins. Co., 152 Hawaiʻi 225, 239, 524 P.3d 1249, 1263 (App. 2023) (explaining that "the burden of establishing work product protection lies with the proponent, and it must be specifically raised and demonstrated rather than asserted in a blanket fashion") (citation omitted).

HRCP Rule 26 governs work product, and provides in relevant part as follows:

> A party may obtain discovery of documents, electronically stored information, and tangible things otherwise discoverable under subdivision (b)(1) of this Rule and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the party seeking discovery has <u>substantial need</u> of the materials in the preparation of the party's case and that the party is <u>unable without undue hardship to obtain the substantial equivalent of the materials by other means</u>. In ordering discovery of such materials when the required showing has been made, <u>the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation</u>.

HRCP Rule 26(b)(4) (emphases added).

"[T]he relevant inquiry for determining whether a document can be protected by work product doctrine is whether the document was prepared in anticipation of litigation or trial." Anastasi, 137 Hawaiʻi at 113-14, 366 P.3d at 169-70. And "[m]ost courts have recognized that an insurance carrier's investigation of a claim is generally performed in the ordinary course of business and not protected by work product doctrine." Id. at 114, 366 P.3d at 170.

Hawaiʻi courts have adopted the "because of" test in situations where a document serves more than one purpose or "was not prepared exclusively for litigation." Id. at 113, 366 P.3d at 169; see also Moe v. Sys. Transp., Inc., 270 F.R.D. 613, 625 (D. Mont. 2010) (noting the "because of" standard often applies to insurance claims investigations). "In applying the 'because of' standard, courts must consider the totality of the circumstances and determine whether the 'document was created because of anticipated litigation, and would not have been created in substantially similar form but for the prospect of litigation.'" Anastasi, 137 Hawaiʻi at 113, 366 P.3d at 169.

The Treacy declaration set forth the sequence of events - Mattoch sent a letter of representation on August 28, 2012, the insurer engaged the services of an investigator on September 11, 2012, and Watanabe prepared a report dated October 9, 2012. The Treacy declaration also restated that the

report itself was labeled, "This Confidential Report Is Submitted In Anticipation Of Future Litigation.  It Is And Should Always Be Considered Attorney/Client Work Product."

Other than providing the order of events and restating the report's self-labeling, the Treacy declaration does not provide any insight as to the purpose of the Watanabe Report, whether it was created "because of" litigation, or that it would not have been created in the ordinary course of business.  See Anastasi, 137 Hawaiʻi at 114, 366 P.3d at 170 ("Nowhere in the rule is there reference to when a document is prepared.  Instead, the rule clearly focuses on the purpose of the prepared material and not on when it is prepared").

Moreover, the Treacy declaration makes no statement as to whether the Watanabe Report contains "the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation."  See HRCP Rule 26(b)(4) (providing that "the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning litigation").

Based on the evidence it presented to the circuit court, Jack's failed to meet its burden of showing that the Watanabe Report was not subject to production under the rules of

31

discovery. Thus, the circuit court did not abuse its discretion in ordering production of the Watanabe Report.

### c. Spoliation of the Chair

Jack's also argues that the court based its spoliation finding on the contents of the Watanabe Report, which was not authenticated and contained inadmissible hearsay.

Here, in moving for sanctions, the Dahlagers offered, among other things, the Watanabe Report to show the chairs were returned to Walmart.[10]

During the hearing on the Dahlagers' request for sanctions, the circuit court stated that the "subject chair was returned to [Walmart] and only discovered through the Court's -- well as the Court ordered the Motion to Compel." The circuit court continued, "there's no dispute that the subject chair is not available at this time" and the Dahlagers "will be suffering prejudice as a result of [Jack's] destroying or withholding the discovery evidence, the chair." The circuit court then ruled that "inequity would occur in allowing [Jack's] in this case [to] accrue benefit from its conduct in destroying the chair."

The circuit court subsequently ordered that Jack's "will be precluded from opposing or claiming that nothing was

---

[10] The Dahlagers proffer that the circuit court had "the [Walmart] receipts produced in discovery showing that all 10 of the chairs purchased on June 8, 2012 had been returned on July 26, 2012[.]" But, the return receipt shows only "General Mdse" was returned with no specific description of item or quantity.

wrong with the chair, because Plaintiffs have not had an opportunity to inspect the chair." The circuit court awarded the Dahlagers attorney's fees and costs related to the two motions to compel.

Ultimately, there was no dispute Jack's destroyed the chair, which was key evidence in this case. And Jack's was on notice that litigation arising from Robert's fall from the chair was a possibility.

Based on the particular circumstances in this case, we cannot conclude that error, if any, in relying on the Watanabe Report injuriously affected Jack's substantial rights. Hawaii Revised Statutes § 641-2 (2016) (providing in part that "[n]o judgment, order or decree shall be reversed, amended, or modified for any error or defect, unless the court is of the opinion that it has injuriously affected the substantial rights of the appellant").

C.  **Precluding Causation Testimony by Treatment Providers**

In their third point of error, the Dahlagers contend the circuit court abused its discretion "in granting [Jack's] Motion to Limit Testimony from Treating Physicians, sustaining [Jack's] objections to opinion testimony by [Mary] based on this ruling, and denying [the Dahlagers'] Oral Motion to Reconsider its ruling." The Dahlagers specifically maintain they were unable to prove a defective chair legally caused the injury

33

because the court limited testimony from Robert's non-retained treating physicians because the Dahlagers did not provide written expert reports by the court's deadline.

"The Hawai'i Supreme Court has held that complete and accurate pretrial discovery of expert witnesses is critical to a fair trial." Barbee v. Queen's Med. Ctr., 119 Hawai'i 136, 157, 194 P.3d 1098, 1119 (App. 2008) (cleaned up). "Pretrial disclosure of expert witnesses is necessary because effective cross-examination of an expert witness requires advance preparation." Id. (cleaned up). Also, HRCP Rule 26, "is designed to promote candor and fairness in the pretrial discovery process and to eliminate surprises at trial." Id. (citation and internal quotation marks omitted).

Here, the circuit court ordered the Dahlagers to provide written expert reports by November 10, 2016, giving the Dahlagers almost nine months to obtain expert reports. The Dahlagers, however, did not do so. Jack's contended that the Dahlagers' failure to provide expert reports and medical records related to the fall deprived it of critical information needed to prepare for cross-examination of these experts.

To be clear, Robert's treating physicians were not completely precluded from testifying. They were only precluded from testifying as to the cause of Robert's injuries.

34

Further, as Jack's asserts, Robert's medical records were admitted into evidence. Regarding certain records from Kaiser, the circuit court found that those records made no mention of the fall at Jack's.

As to Mary's testimony, the circuit court found Mary "qualified as an expert in the area of physical therapy." When the Dahlagers' counsel attempted to solicit Mary's expert opinion regarding the cause of Robert's injury, the circuit court cautioned counsel "about the motion in limine regarding providing any type of opinion when there's no report submitted."

The Dahlagers' counsel then attempted to ask Mary about causation and treatment of Robert's injury after the incident at Jack's. Jack's objected, and the circuit court sustained, informing the Dahlagers' counsel that Mary "should have submitted a report as to her treatment and the reasons why." The court warned:

> You cannot use the back door to try to get in reports of what she knew and how she treated [Robert] when in fact there were specific instructions in this case and orders by this court that if you're gonna call someone as an expert that you need to submit the reports by November 10, 2016[.]

Under the court's order, Mary should have provided a report if she was being held out as an expert who provided Robert treatment and was going to testify as to the cause of his injuries.

In sum, the circuit court did not abuse its discretion in limiting the testimony of treatment providers as to causation.

### III. CONCLUSION

Based on the foregoing, we affirm the circuit court's (1) August 16, 2017 Final Judgment; (2) June 2, 2017 "Findings of Fact and Conclusions of Law and Order After Jury-Waived Trial"; (3) February 17, 2017 "Order Granting Plaintiffs' Motion to Compel Production of Documents filed December 27, 2016"; (4) March 1, 2017 "Order Granting Plaintiffs' Motion to Compel Discovery and for Discovery Sanctions filed January 13, 2017"; (5) March 23, 2017 "Order Granting Fees and Costs Related to Plaintiff's Motion to Compel Production of Documents filed December 27, 2016"; and (6) March 23, 2017 "Order Granting Fees and Costs Related to Plaintiffs' Motion to Compel Discovery and for Discovery Sanctions filed January 13, 2017[.]"

DATED:  Honolulu, Hawai'i, June 26, 2023.

On the briefs:

Scott E. Kubota,
Christopher S. Bouslog,
for Plaintiffs-Appellants/
Cross-Appellees.

Gary G. Grimmer,
Ann Correa,
for Defendant-Appellee/
Cross-Appellant.

/s/ Lisa M. Ginoza
Chief Judge

/s/ Clyde J. Wadsworth
Associate Judge

/s/ Sonja M.P. McCullen
Associate Judge